**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. TERRY CHRISTENSEN, *Defendant-Appellant*. | No. 08-50531 D.C. No. 2:05-cr-01046-DSF-8 |

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. ANTHONY PELLICANO, *Defendant-Appellant*. | No. 08-50570 D.C. No. 2:05-cr-01046-DSF-1 |

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. MARK ARNESON, *Defendant-Appellant*. | No. 09-50115 D.C. No. 2:05-cr-01046-DSF-7 |

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee*,

                    v.

RAYFORD EARL TURNER, AKA
Seal B,
          *Defendant-Appellant*.

No. 09-50125

D.C. No.
2:05-cr-01046-
DSF-2

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee*,

                    v.

ABNER NICHERIE,
          *Defendant-Appellant*.

No. 09-50128

D.C. No.
2:05-cr-01046-
DSF-6

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee*,

                    v.

KEVIN KACHIKIAN,
          *Defendant-Appellant*.

No. 09-50159

D.C. No.
2:05-cr-01046-
DSF-3

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

RAYFORD EARL TURNER, AKA
Seal B,
*Defendant-Appellant*.

No. 10-50434

D.C. No.
2:05-cr-01046-
DSF-2

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

MARK ARNESON,
*Defendant-Appellant*.

No. 10-50462

D.C. No.
2:05-cr-01046-
DSF-7

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

ANTHONY PELLICANO, AKA Seal A,
*Defendant-Appellant*.

No. 10-50464

D.C. No.
2:05-cr-01046-
DSF-1

UNITED STATES OF AMERICA,
     *Plaintiff-Appellee*,

    v.

TERRY CHRISTENSEN,
     *Defendant-Appellant*.

No. 10-50472

D.C. No.
2:05-cr-01046-
DSF-8


ORDER AND
AMENDED
OPINION


Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge, Presiding

Argued and Submitted
November 4, 2013—Pasadena, California

Filed August 25, 2015
Amended July 8, 2016

Before: Raymond C. Fisher and Richard R. Clifton, Circuit
Judges, and Dana L. Christensen, Chief District Judge.[*]

Order;
Opinion by Judge Clifton;
Partial Concurrence and Partial Dissent by Chief District
Judge Christensen

---

[*] The Honorable Dana L. Christensen, United States Chief District Judge
for the District of Montana, sitting by designation.

# SUMMARY[**]

## Criminal Law

The panel amended an opinion filed August 25, 2015, affirming in part, vacating in part, and remanding, in a case in which six defendants were convicted of multiple offenses stemming from a widespread criminal enterprise offering illegal private investigation services in Southern California; denied petitions for panel rehearing filed by appellants Kevin Kachikian, Terry Christensen, and Mark Arneson; and denied on behalf of the court Kachikian's, Christensen's, and Arneson's petitions for rehearing en banc.

The panel vacated Rayford Earl Turner's conviction for aiding and abetting computer fraud, Arneson's convictions for computer fraud and unauthorized computer access, and Anthony Pellicano's convictions for aiding and abetting both computer fraud and unauthorized computer access. The panel also vacated Abner Nicherie's conviction for aiding and abetting a wire interception. The panel affirmed the rest of the convictions, including the RICO convictions of Pellicano, Arneson, and Turner for operating Pellicano Investigative Agency's (PIA's) criminal enterprise, attorney Christensen's convictions based on hiring that enterprise to illegally wiretap a litigation opponent, and Kachikian's convictions for his role in PIA's wiretapping. The panel vacated the sentences imposed on the defendants whose convictions were vacated in part – Pellicano, Arneson, and Turner – and remanded for

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

resentencing on their remaining, affirmed convictions. The panel remanded for further proceedings on the vacated counts of conviction, including the possibility of retrial, as may be appropriate, on those charges.

Regarding Pellicano's, Arneson's, and Turner's convictions for racketeering and RICO conspiracy, the panel (1) held that the government presented sufficient evidence from which the jury could conclude that Arneson and Turner knew about the essential nature of their illegal enterprise with Pellicano; and (2) rejected Pellicano and Arneson's challenges to (a) the bribery predicate acts upon which their RICO convictions rest and (b) Pellicano's challenge to the predicate acts of honest services fraud.

The panel held that the jury instructions defining both computer fraud and unauthorized computer access of United States agency information under the Computer Fraud and Abuse Act (CFAA) were plainly erroneous, and that the error was prejudicial. The panel therefore vacated Turner's conviction for aiding and abetting computer fraud, Arneson's convictions for computer fraud and unauthorized computer access, and Pellicano's convictions for aiding and abetting both computer fraud and unauthorized computer access. The panel rejected Turner, Arneson, and Pellicano's contention that their convictions for identity theft and racketeering cannot stand once the CFAA computer fraud and unauthorized computer access convictions have been set aside.

The panel rejected Kachikian's challenges to the jury instructions which, he argued, required reversal of his convictions for conspiracy to intercept wire communications and manufacturing and/or possessing a wiretapping device.

The panel held that after the Electronic Communications Privacy Act of 1986, by which Congress substituted the word "intentionally" for "willfully" in 18 U.S.C. §§ 2511 and 2512, the operative question is whether the defendant acted consciously and deliberately with the goal of intercepting wire communications. The panel explained that whether the defendant had a good or evil purpose is irrelevant.

The panel vacated Nicherie's conviction for aiding and abetting wiretapping. The panel held that one of the government's two theories was improper, and that although there was sufficient evidence to support a conviction on the other theory, the evidence was not so overwhelming to conclude that the error was harmless.

The panel held that the substantial majority of recordings that Pellicano secretly made of his conversations with Christensen did not qualify for protection under the attorney-client privilege, that production of the limited portions that might have been privileged was harmless, and that the recordings did not qualify for production under the work product doctrine.

The panel held that the district court's findings regarding a juror's untruthfulness and unwillingness during deliberations to follow the law were not clearly erroneous, that those findings provided cause for dismissing the juror, and that neither dismissal of the juror nor the denial of the defendants' motion for a new trial was an abuse of discretion.

Affirming Christensen's sentence, the panel rejected the defendant's challenges to an upward adjustment for supervisory role, to an enhancement for economic gain, and to an adjustment for abuse of a position of trust. The panel

held that Christensen's sentence, which included an upward departure for substantial harm not accounted for in the Sentencing Guidelines, was not substantively unreasonable.

The panel rejected Pellicano's argument that the matter should be assigned to a different district judge.

The panel held that the district court did not err in ordering Pellicano, Turner, and Arneson to forfeit $2,008,250, which represents the proceeds they obtained from their RICO enterprise. The panel rejected the defendants' argument that they had a right to a jury trial on the forfeiture amount, that the district court used the incorrect standard of proof, that the district court incorrectly calculated the amount, and that liability should not have been joint and several.

The panel addressed others issues in a concurrently filed memorandum disposition.

Concurring in part and dissenting in part, Chief District Judge Christensen wrote that the district court erred by dismissing the juror based on a determination that he was not credible and had lied to the court on an unrelated issue concerning his views on federal tax laws.

## COUNSEL

Seth M. Hufstedler (argued), Dan Marmalefsky (argued), and Benjamin J. Fox, Morrison & Foerster LLP, Los Angeles, California, for Defendant-Appellant Terry Christensen.

Steven F. Gruel (argued), San Francisco, California, for Defendant-Appellant Anthony Pellicano.

Chad S. Hummel (argued) and Emil Petrossian, Manatt, Phelps & Phillips LLP, Los Angeles, California; Becky Walker James, Los Angeles, California, for Defendant-Appellant Mark Arneson.

Karen L. Landau (argued), Oakland, California, for Defendant-Appellant Rayford Lee Turner.

Katherine Kimball Windsor (argued), Pasadena, California, for Defendant-Appellant Abner Nicherie.

Benjamin L. Coleman (argued), Coleman & Balogh LLP, San Diego, California, for Defendant-Appellant Kevin Kachikian.

André Birotte Jr., United States Attorney, Central District of California, Robert E. Dugdale, Chief, Criminal Division, Kevin M. Lally (argued) and Joshua A. Klein (argued), Assistant United States Attorneys, for Plaintiff-Appellee.

**ORDER**

The opinion filed August 25, 2015 is hereby amended as follows: The last paragraph on page 41 through the last paragraph on page 43 of the slip opinion should be removed and replaced with the following:

> The main theory of Kachikian's defense was that Kachikian lacked the required criminal intent because he believed Pellicano was using his Telesleuth software for lawful purposes. The court instructed the jury that the government had to prove that "the defendant acted intentionally, that is, purposefully and deliberately and not as a result of accident or mistake" in order to merit a guilty verdict under § 2511. This instruction was both accurate and adequate.
>
> Kachikian contends that the word "intentionally" in §§ 2511 and 2512 must be read to require a defendant to know that his conduct is unlawful.[10] He bases his argument on the history of the wiretapping statutes. As originally enacted, the statutes applied to any person who "willfully" intercepted a wire communication or who "willfully"

---

[10] Section 2511 applies to anyone who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a). Section 2512 applies to anyone who "intentionally . . . manufactures, assembles, possesses, or sells" a wiretapping device. 18 U.S.C. § 2512(1)(b).

manufactured or possessed a wiretapping device. *See United States v. McIntyre,* 582 F.2d 1221, 1225 (9th Cir. 1978). In 1986, as part of the Electronic Communications Privacy Act (ECPA), Congress substituted the word "intentionally" for the word "willfully" in §§ 2511 and 2512. Kachikian argues that this substitution was not intended to reduce the statute's mental state requirement, but rather to increase it. In support of this argument, he cites to a footnote in Chief Justice Rehnquist's dissent in *Bartnicki v. Vopper*, 532 U.S. 514, which describes Congress as having "increased the scienter requirement" in 1986 "to ensure that only the most culpable could face liability for disclosure." *Id.* at 547 n.4 (Rehnquist, C.J., dissenting).

The *Bartnicki* dissent reflects the massive confusion in the courts pre-ECPA over the meaning of the word "willfully." Although the Ninth Circuit had clearly defined a willful act as one "done with a 'bad purpose' or 'evil motive,'" *McIntyre*, 582 F.2d at 1225, some courts had interpreted "willful" to include acts that involved "some form of inadvertence, oversight, or negligence," Stephen J. Brogan, *Analysis of the Term Willful in Federal Criminal Statutes*, 51 NOTRE DAME L. REV. 786, 787 (1976) (cited in H.R. Rep. No. 99–647). Under this interpretation, "a judge can find an act to be 'willful' even though it was not committed intentionally." *Id.*

In changing the word from "willfully" to "intentionally," Congress clarified that §§ 2511 and 2512 "do not impose a duty to inquire into the source of the information and one could negligently disclose the contents of an illegally intercepted communication without liability." *Bartnicki*, 532 U.S. at 547. Rather, the statutes require an intentional act, defined as "an act that is being done on purpose." S. Rep. No. 99–541, at 24 (1986). However, the word "intentional . . . does not suggest that the act was committed for a particular evil purpose." *Id.* "An 'intentional' state of mind means that one's state of mind is intentional as to one's conduct or the result of one's conduct if such conduct or result is one's conscious objective." *Id.* at 23; *see also* H.R. Rep. No. 99–647, at 48 (1986).

Thus, after ECPA, the operative question under § 2511 is whether the defendant acted consciously and deliberately with the goal of intercepting wire communications. "The intentional state of mind is applicable only to conduct and results." *In re Pharmatrak, Inc.*, 329 F.3d 9, 23 (1st Cir. 2003) (quoting S. Rep. No. 99–541). "[L]iability for intentionally engaging in prohibited conduct does not turn on an assessment of the merit of a party's motive." *Id.* "The question of whether the defendant had a good or evil purpose in utilizing the [] recording equipment is, therefore, irrelevant." *United States v. Townsend*, 987 F.2d 927, 931 (2d

Cir. 1993); *see also United States v. Hugh*, 533 F.3d 910, 912 (8th Cir. 2008) (holding that § 2511 requires "only" proof of intent and not of willfulness).

As the instruction presented to the jury was sufficient to establish the requisite intent under § 2511, there was no error.

With this amendment, the petition for panel rehearing and for rehearing en banc filed by Appellant Kevin Kachikian on November 12, 2015 is **DENIED**. The full court has been advised of the petition for rehearing en banc and no judge of the court has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35. Kachikian may file a new petition for rehearing and rehearing en banc from the amended opinion.

The petitions for panel rehearing and for rehearing en banc filed by Appellants Terry Christensen and Mark Arneson on November 13, 2015 are **DENIED**. The full court has been advised of Christensen and Arneson's petitions for rehearing en banc and no judge of the court has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35. No further petitions for rehearing or rehearing en banc will be entertained from either Christensen or Arneson.

Appellant Terry Christensen's November 13, 2015 Motion for Judicial Notice is **GRANTED**.

**OPINION**

CLIFTON, Circuit Judge:

Six defendants appeal their criminal convictions stemming from a widespread criminal enterprise offering illegal private investigation services in Southern California. At the center of this criminal enterprise was Pellicano Investigative Agency, known as PIA. Defendant Anthony Pellicano operated PIA, ostensibly as a legitimate private investigation agency. But many of PIA's investigation methods were, in fact, illegal. Pellicano bribed Los Angeles area police officers, such as Defendant Mark Arneson, for access to confidential law enforcement databases. He orchestrated wiretaps on investigative targets so he could overhear their conversations with friends, family, medical professionals, and legal counsel. He paid a telephone company employee, Defendant Rayford Turner, for the confidential technical information he needed for the wiretaps, and hired a software developer, Defendant Kevin Kachikian, to create custom software to record the conversations Pellicano overheard. At the height of PIA's success, scores of people retained PIA for its often illegal services. Most pertinent to this case, Defendant Terry Christensen, an attorney, hired PIA to assist in litigation in which he represented his client, Kirk Kerkorian, against Lisa Bonder. Pellicano wiretapped Bonder's telephone and frequently discussed with Christensen what he heard. Defendant Abner Nicherie also hired PIA to wiretap the husband of a woman whose business Nicherie hoped to take over.

PIA's criminal enterprise began to unravel in 2002, when the FBI investigated PIA's attempt to intimidate a reporter, Anita Busch. This investigation led to a search, pursuant to a

search warrant, of PIA's offices. By 2003, the government was investigating the widespread scope of PIA's illegal activities. A grand jury returned an indictment charging Pellicano, Arneson, and Turner with crimes under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.*, for their roles in operating PIA's criminal enterprise. The indictment also variously charged Defendants with other crimes, including wiretapping, computer fraud, honest services fraud, identity theft, and conspiracy offenses. The case proceeded to two separate jury trials, which resulted in the convictions of all six Defendants on at least some counts. Defendants appeal their convictions.

In this opinion, we vacate Turner's conviction for aiding and abetting computer fraud, Arneson's convictions for computer fraud and unauthorized computer access, and Pellicano's convictions for aiding and abetting both computer fraud and unauthorized computer access. We also vacate Nicherie's conviction for aiding and abetting a wire interception. The rest of the convictions are affirmed, including the RICO convictions of Pellicano, Arneson, and Turner for operating PIA's criminal enterprise, Christensen's convictions based on hiring that enterprise to illegally wiretap Lisa Bonder, and Kachikian's convictions for his role in PIA's wiretapping. We vacate the sentences imposed on the defendants whose convictions were vacated in part—Pellicano, Arneson, and Turner—and remand for resentencing on their remaining, affirmed convictions. We remand for further proceedings on the vacated counts of conviction, including the possibility of retrial, as may be appropriate, on those charges.

Defendants have raised a staggering number of issues on appeal. Their briefs—fourteen in all—totaled over 900

pages.[1]  Many of the issues raised on appeal do not warrant discussion in a precedential opinion. We thus address many issues in a concurrently filed memorandum disposition, in which we affirm on all the issues covered in the memorandum.  In this opinion, we address those issues that merit an extended discussion.

## I.  Background

These consolidated appeals arise out of the prosecution in two separate trials of private investigator Defendant Anthony Pellicano and several individuals associated with him. Pellicano owned and operated Pellicano Investigative Agency ("PIA").  He provided investigation services to clients in connection with litigation and personal matters.

The factual core of this case is simple: PIA's investigations were often illegal. Pellicano wiretapped investigative targets, for instance, and used proprietary software called "Telesleuth," which Defendant Kevin Kachikian developed and updated over the course of several years, to record wiretapped phone conversations.  Pellicano related the content of those conversations (e.g., by playing recordings) to clients, who often used what they learned to gain an advantage in litigation.

To get the technical information he needed to install the wiretaps, Pellicano paid Defendant Rayford Turner, a telephone company technician, to obtain cable-pairing data from the telephone company, SBC. Turner himself did not have access to SBC databases, but he paid other SBC

---

[1] The government was similarly verbose. Its answering brief was nearly 700 pages.

employees, non-parties Teresa Wright and Michele Malkin, to access the databases and give Turner the information PIA wanted.  Turner then gave the information to Pellicano and implemented wiretaps.  Pellicano and PIA also paid an LAPD officer, Defendant Mark Arneson, to search confidential police databases for information about various investigative targets and provide that information to PIA.[2]

PIA's activity on behalf of client Robert Pfeifer concisely illustrates how Pellicano, Arneson, and Turner operated the illegal investigations. Pfeifer, not named as a party in this case, retained PIA in July 2000 to influence his former girlfriend, Erin Finn, to recant deposition testimony about Pfeifer's drug use.  The evidence established that Pellicano paid Arneson $2,500, and that Arneson accessed law-enforcement databases to acquire criminal history and/or information from the Department of Motor Vehicles (DMV) on Pfeifer, Finn, and Finn's friends and associates.  Arneson then gave this information to Pellicano. Turner provided Pellicano with confidential subscriber information from SBC, and a wiretap on Finn was initiated. The wiretap revealed extensive information about Finn's business, which Pfeifer used to get her to recant her testimony.

Based on Pfeifer's case and many others, the grand jury returned an indictment charging Pellicano, Arneson, and Turner with RICO violations. The indictment alleged that they formed an enterprise for "the common purpose of earning income through the conduct of diverse criminal activities including, but not limited to, illegal wiretapping, unauthorized access of protected computers, wire fraud,

---

[2] Pellicano also paid at least one other police officer for information from police databases. That person was not charged in this action.

bribery, identity theft, and obstruction of justice." The predicate acts included bribery, honest services wire fraud, and identity theft. Kachikian, the Telesleuth developer, was not charged with RICO violations; he was charged with conspiracy to intercept, interception of communications, and possession of a wiretapping device.

The government also prosecuted two of PIA's clients: Defendants Abner Nicherie and Terry Christensen. Abner Nicherie hired Pellicano to wiretap Ami Shafrir, the husband of Sarit Shafrir, whose business Nicherie hoped to take over. Nicherie went to PIA many times to listen to and transcribe Ami Shafrir's telephone conversations, which were in Hebrew. The intercepted conversations included Ami Shafrir's confidential communications with his attorneys.

Terry Christensen hired Pellicano to wiretap Lisa Bonder. Bonder was engaged in a child support dispute with Christensen's client, Kirk Kerkorian. A central part of Christensen's strategy was proving that the child involved in the dispute was not his client's biological child. A DNA test eventually proved that another man was the father. While the litigation was ongoing, Pellicano intercepted many of Bonder's conversations, including conversations with her attorneys, family, and friends about the child support litigation. The main evidence against Christensen consisted of recordings of more than 30 phone conversations in which he discussed with Pellicano the wiretap on Bonder. These recordings, which Pellicano recorded secretly, were seized from PIA's offices.

The government's investigation into PIA began when it investigated threats against reporter Anita Busch. On the morning of June 20, 2002, Busch went to her car on the street

outside her home and found that her car had been vandalized. The windshield had been punctured, a handwritten sign reading "STOP" had been placed on the car, and a dead fish and a rose had been left on the windshield. An informant recorded his conversations with Alex Proctor, who stated that Pellicano had hired him to vandalize Busch's car. Based in large part on the informant's recordings, in November 2002, the government obtained warrants to search PIA for evidence that Pellicano was involved in the vandalism. The government seized computers and data storage devices pursuant to the warrant. After obtaining more evidence of the widespread extent of PIA's illegal investigations, the government obtained more warrants in July 2003 and seized additional records from the data storage devices previously taken from PIA, including the Pellicano-Christensen recordings.

A grand jury returned an indictment,[3] and the Defendants were prosecuted in two trials. The first trial included (1) RICO and related charges against Pellicano, Arneson, and Turner and (2) wiretapping and related charges against Pellicano, Kachikian, and Nicherie. The second trial, in which only Pellicano and Christensen were defendants, focused on the Lisa Bonder wiretap.

The Defendants in the first trial (Pellicano, Arneson, Turner, Kachikian, and Nicherie) were convicted on the following charges:

---

[3] The Fifth Superseding Indictment was the operative charging document. The government filed a redacted Fifth Superseding Indictment during the first trial, which dismissed some counts and renumbered the remaining ones.

Pellicano:     RICO (18 U.S.C. § 1962(c));
               RICO conspiracy (18 U.S.C. § 1962(d));
               Honest-services wire fraud (18 U.S.C.
               §§ 1343, 1346);
               Unauthorized computer access of
               United States agency information
               (18 U.S.C. §§ 1030(a)(2)(B),
               (c)(2)(B)(i));
               Identity theft (18 U.S.C. § 1028(a)(7));
               Computer fraud (18 U.S.C.
               § 1030(a)(4));
               Conspiracy to intercept and use wire
               communications (18 U.S.C. § 371);
               Interception of wire communications
               (18 U.S.C. § 2511(1)(a), (d)); and
               Possession of a wiretapping device
               (18 U.S.C. § 2512(1)(b)).

Arneson:       RICO (18 U.S.C. § 1962(c));
               RICO conspiracy (18 U.S.C. § 1962(d));
               Honest services wire fraud (18 U.S.C.
               §§ 1343, 1346);
               Unauthorized computer access of
               United States agency information
               (18 U.S.C. § § 1030(a)(2)(B),
               (c)(2)(B)(i));
               Identity theft (18 U.S.C. § 1028(a)(7));
               Computer fraud (18 U.S.C.
               § 1030(a)(4)).

Turner:        RICO (18 U.S.C. § 1962(c));
               RICO conspiracy (18 U.S.C. § 1962(d));
               Identity theft (18 U.S.C. § 1028(a)(7));
               Computer fraud (18 U.S.C.

§ 1030(a)(4));
Conspiracy to intercept and use wire communications (18 U.S.C. § 371); Interception of wire communications (18 U.S.C. § 2511(1)(a), (d)); and False statements (18 U.S.C. § 1001(a)(2)).

Kachikian:    Conspiracy to intercept and use wire communications (18 U.S.C. § 371); Possession of a wiretapping device (18 U.S.C. § 2512(1)(b)).

Nicherie:    Aiding and abetting interception of wire communications (18 U.S.C. § 2511(a), (d)).

The jury acquitted Pellicano of one count of unauthorized computer access, Turner of four counts of intercepting wire communications, and Kachikian on all counts of intercepting wire communications.

In the second trial, Pellicano and Christensen were each convicted of one count of conspiracy to intercept and use wire communications, 18 U.S.C. § 371, and one count of interception of wire communications, 18 U.S.C. §§ 2511(1)(a), (d).

Pellicano was sentenced to 180 months of imprisonment, Arneson to 121 months, Turner to 121 months, Kachikian to 27 months, Nicherie to 21 months, and Christensen to 36 months. Pellicano, Arneson, and Turner were also ordered to forfeit $2,008,250, jointly and severally.

## II. Standards of Review

We address the standard of review for most issues as we discuss the relevant arguments below. Because they apply to multiple issues in the case, we address the standards for plain error and clear error review here at the outset.

When a defendant raises an argument for the first time on appeal, the plain error standard of review applies. *See* Fed. R. Crim. P. 52(b); *United States v. Pelisamen*, 641 F.3d 399, 404 (9th Cir. 2011). Plain error requires that (1) there was error; (2) it was plain; and (3) the error affected substantial rights. *United States v. Olano*, 507 U.S. 725, 732–35 (1993). When confronted with plain error, an appeals court shall exercise its discretion and reverse only if the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 736 (internal quotation marks omitted) (alteration in original). Plain error review applies on direct appeal even where an intervening change in the law is the source of the error. *Johnson v. United States*, 520 U.S. 461, 467–68 (1997); *Pelisamen*, 641 F.3d at 404.

We review for clear error a district court's findings of fact. A finding of fact is clearly erroneous only where it is "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *United States v. Pineda-Doval*, 692 F.3d 942, 944 (9th Cir. 2012) (citation and internal quotation marks omitted). Clear error review is deferential, and "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *United States v. Working*, 224 F.3d 1093, 1102 (9th Cir. 2000) (en banc) (quotation omitted).

## III.  Discussion

### A.  Sufficiency of RICO Enterprise

Pellicano, Arneson, and Turner were all convicted of racketeering under the RICO statute, 18 U.S.C. § 1962(c), and also of RICO conspiracy, 18 U.S.C. § 1962(d).  They argue that the evidence was insufficient to prove a single RICO enterprise among Pellicano, PIA, Arneson, and Turner because there was no evidence that Arneson and Turner knew about each other's roles in the enterprise. We are not persuaded by this argument. The government presented sufficient evidence from which the jury could conclude that Arneson and Turner knew about the essential nature of their illegal enterprise with Pellicano.

Defendants challenged the sufficiency of the evidence supporting the RICO enterprise in a Rule 29 motion, which the district court denied.  The denial of a Rule 29 motion for judgment of acquittal is reviewed de novo. *United States v. Chapman*, 528 F.3d 1215, 1218 (9th Cir. 2008). The court "view[s] the evidence in the light most favorable to the government and determine[s] whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (citation and internal quotation marks omitted); *see United States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (en banc).

The RICO provision at issue here, 18 U.S.C. § 1962(c), "makes it unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." *Boyle v. United States*, 556 U.S. 938, 943–44 (2009) (emphasis and internal

quotation marks omitted). A RICO offense is established by "proof of (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *United States v. Fernandez*, 388 F.3d 1199, 1221 (9th Cir. 2004) (citation and internal quotation marks omitted).

RICO defines the term "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). This expansive definition is "not very demanding." *Odom v. Microsoft Corp.*, 486 F.3d 541, 548 (9th Cir. 2007) (en banc). An associated-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *Id.* at 552 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). Such an enterprise has three elements: (1) a common purpose, (2) an ongoing organization, and (3) a continuing unit. *Id.*

"[I]t is sufficient that the defendant know the general nature of the enterprise and know that the enterprise extends beyond his individual role." *United States v. Eufrasio*, 935 F.2d 553, 577 n.29 (3d Cir. 1991) (citation and internal quotation marks omitted). Likewise, a RICO conspiracy under § 1962(d) requires only that the defendant was "aware of the essential nature and scope of the enterprise and intended to participate in it." *Fernandez*, 388 F.3d at 1230 (citation and internal quotation marks omitted). "[T]he point of making the government show that the defendants ha[d] some knowledge of the nature of the enterprise[ ] is to avoid an unjust association of the defendant with the crimes of others. " *United States v. Brandao*, 539 F.3d 44, 52 (1st Cir. 2008). Nonetheless, the definition of a RICO enterprise has "wide reach" and is to be "liberally construed to effectuate its

remedial purposes." *Boyle*, 556 U.S. at 944–45 (internal quotation marks omitted) (holding that a RICO enterprise does not need to have a formal, business-like structure or hierarchy).

As the First Circuit has explained, "[t]he RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise." *United States v. Marino*, 277 F.3d 11, 33 (1st Cir. 2002) (citation and internal quotation marks omitted). For instance, this court affirmed a RICO conspiracy conviction of the wife of a Mexican Mafia member where the evidence showed that she "collected protection money for the [enterprise] on behalf of her husband," "passed messages" among enterprise members, "smuggled drugs into prison[,] and accepted payment for drugs sold on the street." *Fernandez*, 388 F.3d at 1230.

Defendants primarily argue that the evidence was insufficient to prove that Arneson and Turner associated themselves with the common purpose of the same alleged enterprise because they did not know about each other's roles in it. We disagree. The common purpose alleged in the indictment was "earning income through the conduct of diverse criminal activities including, but not limited to, illegal wiretapping, unauthorized access of protected computers, wire fraud, bribery, identity theft, and obstruction of justice." The government presented ample evidence from which a reasonable jury could find, at a minimum, that Arneson and Turner were each aware of the "essential nature and scope" of that enterprise and intended to participate in it.

Arneson's role included illegally accessing law enforcement databases and passing the information to Pellicano. Turner's role included illegally obtaining

information from SBC to facilitate Pellicano's wiretaps. The jury heard evidence that Pellicano paid Arneson and Turner for their roles in the enterprise. Witnesses testified that both Arneson and Turner visited PIA, sometimes at the same time, and even hid from a client together in PIA's kitchen. Although it was not required that either be aware of the specific identity or activity of the other, in this instance the evidence would have permitted a reasonable jury to infer that they were.

Arneson also testified that Pellicano told him about phone company sources and explained the Telesleuth wiretapping software to him. Arneson testified that he thought Pellicano was going to patent Telesleuth and sell it to law enforcement, but a reasonable jury would not be required to credit this testimony. The jury also heard evidence that Pellicano openly told his clients about his illegal wiretapping and access to law enforcement reports. A reasonable jury could have inferred that Pellicano was equally open with Arneson and Turner. In sum, a reasonable jury could easily infer that Arneson and Turner knew about each other and knew about the essential nature of the enterprise in which they were both participating with Pellicano.

Moreover, the jury heard evidence about specific instances in which Arneson and Turner coordinated their activities with Pellicano. *Boyle*, 556 U.S. at 945–46 (explaining that an associated-in-fact enterprise may be proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit" (internal quotation marks omitted)). We return to the example of Robert Pfeifer. As recounted in the background section, above at 17, Pfeifer retained PIA in July 2000 to make his former girlfriend, Erin Finn, retract

damaging deposition testimony about his drug use. The evidence established that on July 20, 2000, Pellicano paid Arneson $2,500, and that on August 2, 2000, Arneson accessed law-enforcement databases to acquire criminal-history and DMV information on Pfeifer, Finn, and her friends and associates, which Arneson then provided to Pellicano. That same day, Turner provided Pellicano with confidential subscriber information from SBC, and a wiretap on Finn was initiated. The government also introduced evidence of other clients for whom Pellicano coordinated the activities of Arneson and Turner.

Accordingly, this is not a case where Arneson and Turner were unjustly associated with Pellicano and PIA or each other. The evidence was sufficient to conclude that each worked together with Pellicano and others to earn money from criminal activities, including illegally accessing confidential databases, bribery, and wiretapping. A reasonable jury could find that Arneson and Turner each knew about the essential nature of this enterprise. The district court did not err in denying Defendants' Rule 29 motion on this issue.

## B. California Bribery Predicate Acts

Pellicano and Arneson also appeal their RICO convictions by challenging the predicate acts upon which those convictions rest. To be liable under RICO, defendants "must be guilty of a 'pattern of racketeering activity,' which requires at least two separate racketeering acts (often called 'predicate acts')." *United States v. Walgren*, 885 F.2d 1417, 1424 (9th Cir. 1989) (citations omitted). Offenses that qualify as "predicate acts" are listed in 18 U.S.C. § 1961(1), including "any act . . . involving . . . bribery . . . which is

chargeable under State law and punishable by imprisonment for more than one year." If convictions for the underlying predicate acts are vacated, then the RICO conviction must also be vacated. *Walgren*, 885 F.2d at 1424.

Here, the jury found that Arneson and Pellicano each committed ten predicate acts of bribery under California law. The predicate acts against Arneson were based on California Penal Code § 68, which makes it a felony for either an executive or ministerial officer to "receive[], or agree[] to receive, any bribe, upon any agreement or understanding that his or her vote, opinion, or action upon any matter then pending, or that may be brought before him or her in his or her official capacity, shall be influenced thereby."[4] Cal. Penal Code § 68(a). The predicate acts of bribery against Pellicano were based on California Penal Code § 67, a parallel prohibition: § 67 prohibits giving bribes and § 68 prohibits receiving them. *See People v. Hallner*, 43 Cal.2d 715, 717, 718 (1954) (explaining that Penal Code § 67 and § 68 are "complementary statutes").

---

[4] The relevant language of § 68(a) reads as follows:

> Every executive or ministerial officer, employee, or appointee of the State of California, a county or city therein, or a political subdivision thereof, who asks, receives, or agrees to receive, any bribe, upon any agreement or understanding that his or her vote, opinion, or action upon any matter then pending, or that may be brought before him or her in his or her official capacity, shall be influenced thereby, is punishable by imprisonment in the state prison for two, three, or four years[.]

Cal. Penal Code § 68(a).

Arneson argues that the evidence against him failed to establish that his access of government databases could have constituted "action upon any matter then pending, or that may [have] be[en] brought before him . . . in his . . . official capacity." Cal. Penal Code § 68(a). The district court rejected similar arguments in denying Arneson's motion to strike the state law bribery predicate acts against him. We agree with the district court.

California law governs the state law predicate acts of bribery charged in the indictment. *United States v. Frega*, 179 F.3d 793, 806 (9th Cir. 1999). We "review *de novo* a district court's determination of state law." *Salve Regina College v. Russell*, 499 U.S. 225, 231 (1991).

The jury heard evidence that Arneson accessed state and federal law enforcement databases to investigate PIA's targets in exchange for payments from Pellicano. Arneson's database access occurred "in his official capacity." To meet this element, Arneson did not need to have "actual authority" to access the databases to relay information to Pellicano, so long as accessing the databases "[fell] within the general scope of his duties and he [purported] to act in his official capacity." *People v. Longo*, 119 Cal.App.2d 416, 420 (Ct. App. 1953); *see also People v. Lips*, 59 Cal.App. 381, 389 (Ct. App. 1922) (explaining that an officer acts in his official capacity by "doing of such acts as properly belong to the office and are intended by the officer to be official").

The evidence, such as testimony about the LAPD manual's standards for using the databases, established that accessing police databases was within the general scope of Arneson's duties. Just as improper action by an officer to free a suspect in custody in exchange for money constituted action

in the officer's "official capacity," so did Arneson's use of his position to access the databases. *Lips*, 59 Cal.App. at 384, 390 (affirming bribery conviction where officer apprehended suspect but then agreed to release him in exchange for money); *see also People v. Markham*, 64 Cal. 157, 159 (Cal. 1883) (explaining that because it is a duty of an officer to arrest, an officer who is paid not to arrest someone is "bribed with respect to a matter which might be a subject of his official action"). Ample evidence at trial established that Arneson used his official position as an LAPD officer to access the databases. Access to the databases was restricted by statute, regulation, and LAPD policy, and Arneson could access them only because of his position as an officer. *See* Cal. Penal Code § 11105(b) (providing that "[t]he Attorney General shall furnish state summary criminal history information to [certain persons, including peace officers], if needed in the course of their duties"); 11 Cal. Code Reg. § 703(b) (providing that criminal records may be released "on a need-to-know basis, only to persons or agencies authorized by [law] to receive criminal offender record information"); 28 U.S.C. § 534(a)(4) (limiting access to federal government database to certain statutorily enumerated parties, such as "the States . . . and penal and other institutions"). Moreover, when he accessed the databases, he used LAPD computer terminals and LAPD-issued passwords. Every time he accessed the databases, Arneson thus purported to act in his official capacity. *See Longo*, 119 Cal.App.2d at 420.

Arneson's database inquiries also involved "matter[s] then pending, or that may [have been] brought before him . . . ." Cal. Penal Code § 68. California law "does not require any specific action to be pending on the date the bribe is received." *People v. Gaio*, 81 Cal.App.4th 919, 929 (Ct. App. 2000) (citation and internal quotation marks omitted). As this

court has explained, "[t]he use of the word 'may'" in § 68 indicates that "payments designed to alter the outcome of any matter that could conceivably come before the official are within the prohibition of the statute." *Frega*, 179 F.3d at 805 (citation and internal quotation marks omitted) (concluding that "a bribe . . . intended to influence, generally, a judge's future actions with respect to matters that may come before him, falls within the statute's prohibitions"). Hence, the matter of whether to "enforce the law against social vices is always before" a police officer like Arneson. *Gaio*, 81 Cal.App.4th at 930. So too is the matter of whether to use his position as an LAPD officer to investigate someone in the Los Angeles area. *Cf. Johnson v. United States*, 333 U.S. 10, 14 (1948) (describing law enforcement as the "competitive enterprise of ferreting out crime"). Arneson's use of his office to investigate someone, via confidential databases or otherwise, necessarily involved a classic type of police "matter"—investigation. *See Gaio*, 81 Cal.App.4th at 931 (holding that evidence was sufficient to support bribery convictions because evidence established that payment was given to influence "any one or more instances, types, or courses of official action").

Arneson's theory that an act brought before an officer must be discretionary finds no support in the cases he cites, which state no such requirement. *See, e.g.*, *Hallner*, 43 Cal.2d at 717, 721 (reversing judgment that "executive officers of the City of Los Angeles are not executive officers of this state as defined in section 67 of the Penal Code"); *see also People v. Jackson*, 42 Cal.2d 540 (1954). Section 68's language also forecloses this argument. Section 68 prohibits "ministerial officers" from receiving a bribe. Cal. Penal Code § 68. Ministerial acts under California law "leave nothing to the exercise of discretion or judgment." *People v. Strohl*,

57 Cal.App.3d 347, 361 (Ct. App. 1976). An officer thus need not be paid for a discretionary act to meet the elements of § 68. In any case, even if discretion were required, Arneson had discretion over what type of investigation to conduct, including what databases to use and what persons to look up.

Similarly, we reject Pellicano's comparable arguments that Arneson's database searches were not "official" and not sufficiently connected to a government proceeding. The evidence was sufficient to find that Pellicano paid Arneson bribes "with intent to influence him in respect to any act, decision, vote, opinion, or other proceeding as such officer." Cal. Penal Code § 67. The database searches were the "acts" that Pellicano influenced, and, as discussed, Arneson was acting in his official capacity under § 68 when he accessed the databases. Likewise, he was acting "as such officer" under § 67.

Pellicano also argues that he could not have bribed Arneson because Arneson was only misusing the resources of his office, not the legal authority of that office. This distinction finds no support in California case law. Moreover, even if this were the right distinction, accessing the databases was a misuse of Arneson's legal authority. As discussed above, he had the authority to access the databases only because he was an officer. The district court did not err in denying the motion to strike the predicate acts of bribery.

## C. Honest Services Fraud Racketeering Acts and *Skilling*

Pellicano also challenges the predicate acts of honest services fraud. The jury found that Pellicano committed 46 such predicate acts and that Arneson committed 44 such acts.

Honest services fraud entails a scheme or artifice to "deprive another," by mail or wire, "of the intangible right of honest services." 18 U.S.C. § 1346; *see also* 18 U.S.C. §§ 1341, 1343. Here, the government's theory of honest services fraud was that Pellicano's payments to Arneson for access to police databases defrauded the public of its right to Arneson's honest services as an officer.

After Pellicano and Arneson were convicted and sentenced, and while their cases were on appeal, the Supreme Court narrowed the scope of the honest services fraud statute. *See Skilling v. United States*, 561 U.S. 358 (2010). Now, only "fraudulent schemes to deprive another of honest services through *bribes or kickbacks* supplied by a third party who had not been deceived" constitute honest services fraud. *Id*. at 404 (emphasis added). Previously it had been held, in this circuit and others, that failing to disclose a conflict of interest could be a basis for honest services fraud, but that is no longer the case. *Id.* at 411.

Pellicano argues that the predicate acts of honest services fraud must be vacated because the jury instructions did not reflect *Skilling*'s narrowing of the crime. We disagree.

The jury found that both Pellicano and Arneson committed bribery predicate acts under California law. Under *Skilling*, bribery remains a basis for honest services fraud. It is apparent from the jury's findings regarding bribery that the Defendants would have been convicted on the bribery theory of honest services fraud by itself. The references to the invalidated conflict of interest theory in the jury instructions and the government's argument at trial therefore did not prejudice Defendants. *United States v. Wilkes*, 662 F.3d 524, 544 (9th Cir. 2011) (holding that "the jury's guilty verdict on

the separate substantive count of bribery [under federal law] confirms beyond any reasonable doubt that the jury would have convicted [the defendant] of honest services fraud if the court's definition had been limited to the bribery basis that *Skilling* expressly approved"; *see also United States v. Marcus*, 560 U.S. 258, 262 (2010) (explaining that prejudice requires a "reasonable probability" that the error in the instructions "affected the outcome of the trial").

Arneson also argues that under *Skilling*, only a bribe or kickback as defined under federal law, as distinguished from state law, may establish honest services fraud. The Fifth Circuit has persuasively rejected a similar argument:

> A fair reading of *Skilling* . . . reveals that the Court was establishing a uniform national standard by construing § 1346 to clearly exclude conduct outside of bribery and kickbacks, such as conflict-of-interest schemes, not to establish *federal law* as the uniform national standard for the elements of bribery and kickbacks in § 1346 prosecutions. Moreover, the *Skilling* Court further asserted that "[o]verlap with other federal statutes does not render § 1346 superfluous. The principal federal bribery statute, [18 U.S.C.] § 201, for example, generally applies only to federal public officials, so § 1346's application to *state and local corruption* and to private sector fraud reaches misconduct that might otherwise go unpunished." Accordingly, we read *Skilling* as recognizing that § 1346 prosecutions may involve misconduct that is also a violation of state law.

*United States v. Teel*, 691 F.3d 578, 583–84 (5th Cir. 2012) (citations and footnote omitted) (emphasis in original). We agree with the Fifth Circuit. The district court did not err on this issue. We affirm.

### D.  Jury Instruction Challenges

Whether jury instructions omit or misstate elements of a statutory crime or adequately cover a defendant's proffered defense are questions of law reviewed de novo. *United States v. Hofus*, 598 F.3d 1171, 1174 (9th Cir. 2010).  We review a district court's formulation of jury instructions for abuse of discretion.  *Id*.  "The trial court has substantial latitude so long as its instructions fairly and adequately cover the issues presented." *United States v. Hicks*, 217 F.3d 1038, 1045 (9th Cir. 2000).  Jury instructions, even if imperfect, are not a basis for overturning a conviction absent a showing that they prejudiced the defendant. *United States v. de Cruz*, 82 F.3d 856, 864–65 (9th Cir. 1996).

### 1.  Computer Fraud and Unauthorized Computer Access Claims

Both computer fraud and unauthorized computer access are crimes under the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030.[5]  Turner was convicted of aiding

---

[5] 18 U.S.C. § 1030(a) provides:

> Whoever— . . . (2) intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains— . . . (B) information from any department or agency of the United States; or . . . (4) knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds

and abetting computer fraud by paying telephone company employees, including Teresa Wright, to obtain cable pairing information from the company's computer system.  This information was then used to facilitate PIA's wiretapping activities.  Arneson was convicted of unauthorized computer access of United States agency information for accessing confidential police databases to obtain information about various PIA investigative targets.  Pellicano was convicted of aiding and abetting both computer fraud and unauthorized computer access for his involvement with Arneson's and Turner's activities.

Following the convictions, this court decided *United States v. Nosal*, 676 F.3d 854 (9th Cir. 2012) (en banc). *Nosal* held the term "exceeds authorized access," an element of both offenses under the CFAA, to be "limited to violations of restrictions on *access* to information, and not restrictions on its *use*."  *Id.* at 864.  Based on *Nosal*, we vacate the convictions under the CFAA.

Nosal was a former employee of the Korn/Ferry executive search firm.  He intended to start a competing enterprise and asked several of his former colleagues to provide him with confidential and proprietary information from the firm's computers.  The Korn/Ferry employees were authorized to access the information for purposes of doing their job, but the use to which they put the information was unauthorized. Nosal was charged with aiding and abetting computer fraud. The district court dismissed the charges against Nosal for

authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value. . . shall be punished as provided in subsection (c) of this section.

failure to state an offense, and we affirmed, noting that a broader definition of the term "access" would allow criminal liability to "turn on the vagaries of private policies." *Id.* at 860.

The district court here instructed the jurors to return a guilty verdict if they found that Turner "knowingly and intentionally aided, counseled, commanded, induced, or procured [a person] to commit the crime of computer fraud," defined in relevant part as "knowingly access[ing] without authorization or exceed[ing] authorized access of a computer . . . with the intent to defraud." The court instructed further:

> [A] defendant exceeds authorized access . . . when the defendant accesses a computer with authorization but uses such access to obtain information in the computer that the defendant is not entitled to obtain.
>
> A defendant obtains information merely by observing it on the computer and need not remove the information from the computer to have violated this section.

No defendant objected to these instructions at trial, and thus our review is for plain error.[6] Although it was not obvious to the district court at the time, this definition of exceeding authorized access was flawed in that it allowed the jury to convict for unauthorized *use* of information rather than only for unauthorized *access*. Such an instruction is

---

[6] As previously noted, the plain error standard applies on direct appeal even where an intervening change in the law is the source of the error. *Johnson*, 520 U.S. at 466–68.

contrary to *Nosal*, and therefore the instruction constituted plain error.

The error was also prejudicial.  Not anticipating *Nosal*, the government made no attempt to prove that Wright accessed any databases that she was not authorized to access in the course of doing her job.  Although the government now contends that Wright's use of the code "ERR" upon logging out in an attempt to cover her tracks constituted evidence of unauthorized access, we are not persuaded.  "ERR" was a code that phone company employees were instructed to use if they accessed an account by accident.  The use of that code did not necessarily prove that the employee was not authorized to access the database. Wright might have used the "ERR" code simply to divert suspicion as to what she was doing.  That use of the "ERR" code may have violated company policy, but Wright may nonetheless have been authorized to access the database. Under *Nosal*, unauthorized use was not enough to support the convictions of Turner and Pellicano for aiding and abetting computer fraud by Wright.

We reach a similar conclusion on the convictions associated with Arneson's misuse of information from the LAPD database.  The government contends that *Nosal* does not preclude criminal liability under the CFAA for violations of state or federal law that restrict access to certain types of information.  *See, e.g.*, 28 C.F.R. § 20.33(d) (restricting the dissemination of certain criminal history information).  This argument lacks merit.  Those laws arguably prohibited Arneson's conduct based on the way the information was used, as distinguished from the way it was accessed, but that does not expand the reach of the CFAA.  Congress has created other statutes under which a government employee who abuses his database access privileges may be punished,

but it did not intend to expand the scope of the federal anti-hacking statute. *See Nosal*, 676 F.3d at 857 & n.3 (refusing to "transform the CFAA from an anti-hacking statute into an expansive misappropriation statute," and citing another statute restricting the use of information under which a defendant might properly be charged).

The jury instructions defining both computer fraud and unauthorized computer access of United States agency information were plainly erroneous under *Nosal*. The error was prejudicial. We therefore vacate Turner's conviction for aiding and abetting computer fraud, Arneson's convictions for computer fraud and unauthorized computer access, and Pellicano's convictions for aiding and abetting both computer fraud and unauthorized computer access. We remand for further proceedings as may be appropriate. If the government so decides, it may seek to retry the defendants on these charges.

## 2. *Identity Theft Claims*

Turner, Arneson, and Pellicano contend that their convictions for certain other offenses cannot stand once the CFAA computer fraud and unauthorized computer access convictions have been set aside. The convictions at issue are for identity theft under 18 U.S.C. § 1028 and racketeering (both the conspiracy and the substantive offense) under 18 U.S.C. § 1962(c)–(d).

Identity theft is defined as the knowing possession, use, or transfer of a means of identification with the intent to

commit another crime under either federal or state law.[7]
18 U.S.C. § 1028.    Similarly, a racketeering conviction
requires the jury to find certain other criminal violations.
Here, to support a conviction for identity theft, the
government alleged criminal intent in the form of either
computer fraud under CFAA or unauthorized computer
access under the California Penal Code.  Identity theft was
then identified as an underlying predicate act for the RICO
conviction.  Defendants argue that the need to vacate their
CFAA convictions requires that the identity theft and RICO
convictions also be set aside.

Defendants' arguments fail.    The alleged errors are
subject to plain error review because timely objections were
not made at trial.  Defendants cannot establish that the CFAA
error prejudiced them or affected their substantial rights in
connection with the identity theft and racketeering
convictions.

To return a guilty verdict for identity theft, the jurors were
instructed that they had to find criminal intent under either
the CFAA, 18 U.S.C § 1030(a)(4), or under California Penal
Code § 502(c)(2).  While the jury instructions relating to the
CFAA were plainly erroneous, the instructions relating to the
California statute were not.  Although a verdict that may be
based on a legally invalid ground must ordinarily be set aside,

---

[7] In relevant part, the text of the identity theft statute reads:
"(a) Whoever, in a circumstance described in subsection (c) of this section
. . . (7) knowingly transfers, possesses, or uses, without lawful authority,
a means of identification of another person with the intent to commit, or
to aid or abet, or in connection with, any unlawful activity that constitutes
a violation of Federal law, or that constitutes a felony under any applicable
State or local law . . . shall be punished as provided in subsection (b) of
this section."  18 U.S.C. § 1028.

*see Griffin v. United States*, 502 U.S. 46, 58 (1991), reversal is not required "if it was not open to reasonable doubt that a reasonable jury would have convicted" the defendant on the valid ground. *Pelisamen*, 641 F.3d at 406 (quoting *United States v. Black*, 625 F.3d 386, 388 (7th Cir. 2010)) (internal quotation marks omitted); *see also Johnson*, 520 U.S. at 470 (declining to exercise discretion to correct plain error where evidence in support of guilt was "'overwhelming'").

We do not doubt that the jury would have convicted Turner, Arneson, and Pellicano for identity theft on the valid ground of underlying intent to violate the California Penal Code. The statute provides:

> (c) Except as provided in subdivision (h), any person who commits any of the following acts is guilty of a public offense . . . (2) Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network.

Cal. Penal Code § 502.[8] "Access" is defined as "to gain entry

---

[8] Subdivision (h) exempts "acts which are committed by a person within the scope of his or her lawful employment." Cal. Penal Code § 502(h)(1). "For purposes of this section, a person acts within the scope of his or her employment when he or she performs acts which are reasonably necessary to the performance of his or her work assignment." *Id*. Defendants do not argue that Wright and Arneson were acting within the scope of their employment. Had they made this argument, we would have rejected it. Neither Wright's nor Arneson's database searches were necessary for the

to, instruct, . . . or communicate with, the logical, arithmetical, or memory function resources of a computer, computer system, or computer network." Cal. Penal Code § 502(b)(1).

Defendants argue that we should interpret the state statute consistent with the federal statute as interpreted by *Nosal*, but we disagree. The statutes are different. In contrast to the CFAA, the California statute does not require *unauthorized* access. It merely requires *knowing* access. *Compare* 18 U.S.C. § 1030(a)(2) *with* Cal. Penal Code § 502(c)(2). What makes that access unlawful is that the person "without permission takes, copies, or makes use of" data on the computer. Cal. Penal Code § 502(c)(2)*.* A plain reading of the statute demonstrates that its focus is on unauthorized taking or use of information. In contrast, the CFAA criminalizes unauthorized *access*, not subsequent unauthorized *use*. *Nosal*, 676 F.3d at 864.

Defendants argue that the state statute's definition of "access" does not cover mere use of the computer. They cite *Chrisman*, 155 Cal.App.4th at 34–35, in which the California Court of Appeal held that a police officer who logged in to a police database to satisfy personal curiosity did not violate the statute because § 502 "defines 'access' in terms redolent of 'hacking,'" and "[o]ne cannot reasonably describe [Chrisman's] improper computer inquiries about celebrities, friends, and others as hacking." Other California Court of Appeal decisions point to a different conclusion, however.

---

performance of any legitimate work assignment. *But see Chrisman v. City of Los Angeles*, 155 Cal.App.4th 29, 34–37 (2007) (policeman who logged in to a police database to satisfy personal curiosity about celebrities was acting within the scope of his employment).

For example, in *Gilbert v. City of Sunnyvale*, 130 Cal.App.4th 1264, 1281 (2005), the court cited § 502(c)(2) in upholding a police officer's termination after he accessed a police database and revealed to a third party the results of the searches he ran. In another case, the court never doubted that the defendant "accessed" information when he made a copy of his employer's proprietary source code and used it to found a competing business. *People v. Hawkins*, 98 Cal.App.4th 1428 (2002).

We conclude that the term "access" as defined in the California statute includes logging into a database with a valid password and subsequently taking, copying, or using the information in the database improperly. We base that conclusion primarily on the plain language of the statute. Otherwise, the words "without permission" would be redundant, since by definition hackers lack permission to access a database. The exception carved out in subdivision (h) provides further support for our position. If access were by definition unauthorized, there would be no need to exempt employees acting within the scope of their lawful employment. Accordingly, we find no error in the jury instructions regarding unauthorized computer access under California law.

Moreover, any error that might have infected the jury instructions was not plain. "'Plain' is synonymous with 'clear' or, equivalently, 'obvious.'" *Olano*, 507 U.S. at 734 (citation omitted). A "court of appeals cannot correct an error [under plain error review] unless the error is clear under current law." *Id*. State case law is yet undeveloped on this issue: the California Supreme Court has never ruled on the definition of access in § 502(c)(2), and thus the asserted error was, and is, not clear. *See Hagan v. Caspari*, 50 F.3d 542,

547 (8th Cir. 1995) ("[W]e are strongly inclined to agree . . . that until the state's highest court has spoken on a particular point of state law, the law of the state necessarily must be regarded as unsettled.").

It is apparent from the jury verdict that the jury found facts that supported a finding of criminal intent under the California statute, so permitting the jury to rely on criminal intent under the CFAA was harmless.  The jury returned guilty verdicts for the substantive offenses of computer fraud and unauthorized computer access under the CFAA.  Even though those convictions must be set aside, the facts that the jury necessarily found in returning those guilty verdicts clearly evince intent under § 502.  Specifically, the jury must have found that Turner induced Wright to provide him with confidential cable pairing information from the phone company database and that Arneson provided Pellicano with confidential criminal history information from the LAPD database.  The jury instructions defined unauthorized access under § 502 as "the knowing access and taking, copying, or making use of data or supporting documentation from a computer, computer system, or computer network without permission to do so."  Given the evidence presented and the verdict rendered, the jury would necessarily have found criminal intent to violate § 502.

Defendants have failed to show prejudice from the erroneous instruction regarding felonious intent under the CFAA as a predicate to identity theft. We affirm both the identity theft and RICO convictions against this challenge.[9]

---

[9] Defendants' other challenges to the California law underlying identity theft also fail.  The statute of limitations argument fails because the relevant statute of limitations is that of identity theft, not that of the

### 3. Kachikian's Wiretapping Claims

Kachikian presents a number of challenges to the jury instructions and argues that they require reversal of his convictions for conspiracy to intercept wire communications in violation of 18 U.S.C. § 2511(1)(a), and manufacturing and/or possessing a wiretapping device in violation of 18 U.S.C. § 2512(1)(b). We are not persuaded by his arguments.

### a. Intent under section 2511

The main theory of Kachikian's defense was that Kachikian lacked the required criminal intent because he believed Pellicano was using his Telesleuth software for lawful purposes. The court instructed the jury that the government had to prove that "the defendant acted intentionally, that is, purposefully and deliberately and not as a result of accident or mistake" in order to merit a guilty verdict under § 2511. This instruction was both accurate and adequate.

---

underlying unauthorized computer access. Indeed, in order to commit the crime of identity theft, one need only have the *intent* to commit a felony; it is irrelevant whether or not the felony was actually committed. 18 U.S.C. § 1028(a)(7). The argument that the state statute is a "wobbler" (*i.e.*, it can be either a felony or misdemeanor depending on the circumstances) fails because a California wobbler "is presumptively a felony." *United States v. Salazer-Mojica*, 634 F.3d 1070, 1073 (9th Cir. 2011). Finally, the argument regarding a lack of instruction to the jury as to a required loss amount fails because the monetary amount limits a different section of the statute. *See* Cal. Penal Code § 502(h)(2) (modifying (c)(3)). Even were that not the case, the error is harmless, as the jury would no doubt have found the information exchanged worth more than $250.

Kachikian contends that the word "intentionally" in §§ 2511 and 2512 must be read to require a defendant to know that his conduct is unlawful.[10]  He bases his argument on the history of the wiretapping statutes.  As originally enacted, the statutes applied to any person who "willfully" intercepted a wire communication or who "willfully" manufactured or possessed a wiretapping device. *See United States v. McIntyre,* 582 F.2d 1221, 1225 (9th Cir. 1978).  In 1986, as part of the Electronic Communications Privacy Act (ECPA), Congress substituted the word "intentionally" for the word "willfully" in §§ 2511 and 2512.  Kachikian argues that this substitution was not intended to reduce the statute's mental state requirement, but rather to increase it.  In support of this argument, he cites to a footnote in Chief Justice Rehnquist's dissent in *Bartnicki v. Vopper*, 532 U.S. 514, which describes Congress as having "increased the scienter requirement" in 1986 "to ensure that only the most culpable could face liability for disclosure." *Id.* at 547 n.4 (Rehnquist, C.J., dissenting).

The *Bartnicki* dissent reflects the massive confusion in the courts pre-ECPA over the meaning of the word "willfully." Although the Ninth Circuit had clearly defined a willful act as one "done with a 'bad purpose' or 'evil motive,'" *McIntyre*, 582 F.2d at 1225, some courts had interpreted "willful" to include acts that involved "some form of inadvertence, oversight, or negligence," Stephen J. Brogan,

---

[10] Section 2511 applies to anyone who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a). Section 2512 applies to anyone who "intentionally . . . manufactures, assembles, possesses, or sells" a wiretapping device. 18 U.S.C. § 2512(1)(b).

*Analysis of the Term Willful in Federal Criminal Statutes*, 51 NOTRE DAME L. REV. 786, 787 (1976) (cited in H.R. Rep. No. 99–647). Under this interpretation, "a judge can find an act to be 'willful' even though it was not committed intentionally." *Id.*

In changing the word from "willfully" to "intentionally," Congress clarified that §§ 2511 and 2512 "do not impose a duty to inquire into the source of the information and one could negligently disclose the contents of an illegally intercepted communication without liability." *Bartnicki*, 532 U.S. at 547. Rather, the statutes require an intentional act, defined as "an act that is being done on purpose." S. Rep. No. 99–541, at 24 (1986). However, the word "intentional . . . does not suggest that the act was committed for a particular evil purpose." *Id.* "An 'intentional' state of mind means that one's state of mind is intentional as to one's conduct or the result of one's conduct if such conduct or result is one's conscious objective." *Id.* at 23; *see also* H.R. Rep. No. 99–647, at 48 (1986).

Thus, after ECPA, the operative question under § 2511 is whether the defendant acted consciously and deliberately with the goal of intercepting wire communications. "The intentional state of mind is applicable only to conduct and results." *In re Pharmatrak, Inc.*, 329 F.3d 9, 23 (1st Cir. 2003) (quoting S. Rep. No. 99–541). "[L]iability for intentionally engaging in prohibited conduct does not turn on an assessment of the merit of a party's motive." *Id.* "The question of whether the defendant had a good or evil purpose in utilizing the [] recording equipment is, therefore, irrelevant." *United States v. Townsend*, 987 F.2d 927, 931 (2d Cir. 1993); *see also United States v. Hugh*, 533 F.3d 910,

912 (8th Cir. 2008) (holding that § 2511 requires "only" proof of intent and not of willfulness).

As the instruction presented to the jury was sufficient to establish the requisite intent under § 2511, there was no error.

### b. Intent under section 2512

Kachikian also argues that the court erred in instructing the jury on the necessary criminal intent for the crime of manufacturing a wiretapping device under § 2512. The instructions required the government to prove that "the defendant knew or had reason to know that the design of [the mechanical or other] device rendered it primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communications." Kachikian contends that the instruction should have required proof that the defendant knew the device would be used illegally. Kachikian misunderstands the statute.

Section 2512 makes it a crime to "intentionally . . . manufacture[], assemble[], possess[], or sell[] any electronic, mechanical, or other device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communications." 18 U.S.C. § 2512(1)(b). "Intentionally," as written in the statute, modifies "manufactures, assembles, possesses, or sells." It does not modify "useful" or "use." The crime lies in intentionally manufacturing the device, knowing that it could be primarily used for wiretapping. The statute does not require intent or knowledge that the device would actually be used unlawfully.

Kachikian argues to the contrary based on the statute's use of the word "surreptitious." Specifically, he points out that § 2512 covers devices "primarily useful for the purpose of the *surreptitious* interception of wire, oral, or electronic communications." *Id*. (emphasis added). He proposed to the district court that the jury be instructed that "surreptitious" interception meant "unauthorized, in other words unlawful" interception. Under this theory, lawful intercepts by law enforcement would not qualify as surreptitious. Kachikian's defense was that if he manufactured the wiretapping devices believing that they would be used primarily for law enforcement-authorized purposes, he would not be breaking the law because he could not have "[had] reason to know that the design of such device renders it primarily useful for . . . surreptitious interception" of wire communications. *Id*.

The term "surreptitious" as used in the statute was aimed at the secret nature of the interception, not the illegality of it. That is the common understanding of the word. *See United States v. Lande*, 968 F.2d 907, 910 (9th Cir. 1992) (holding that equipment manufactured to intercept and descramble satellite television programming met the "surreptitious" element because the producers of satellite programming were unable to detect the interception equipment); *United States v. Bast*, 495 F.2d 138, 143 (D.C. Cir. 1974) ("The words 'surreptitious interception' connote[], in plain and ordinary usage, 'secret listening.'" (footnote omitted)). The relevant perspective is that of the persons whose communications are intercepted. In this context, "surreptitious interception" means an interception of which the targets are unaware.

Even were we to accept Kachikian's definition of surreptitious, i.e., "secret and unauthorized; clandestine; action by stealth or secretly," *United States v. Biro*, 143 F.3d

1421, 1428 (11th Cir. 1993), that does not require us to accept that "surreptitious interception" excludes wiretaps by law enforcement. What matters is that the interception was not authorized by the persons involved in the communication. Accordingly, the court properly rejected Kachikian's instruction as to the meaning of the word "surreptitious."

Moreover, Kachikian's interpretation does not make sense in light of the rest of the statute. Congress carved out an exception in § 2512(2)(b) for private citizens who manufacture wiretapping devices under government contract. That exception provides: "It shall not be unlawful under this section for . . . an officer, agent, or employee of, or a person under contract with, the United States, a State, or a political subdivision thereof, [to manufacture or possess a wiretapping device]." 18 U.S.C. § 2512(2)(b). Kachikian does not fit within that exception, and he does not contend otherwise. That exception would be unnecessary if lawful government wiretaps were, by definition, not covered by the statute because they are not surreptitious. Were that the case, the manufacture of wiretapping devices under government contract would already be exempt from criminal liability under § 2512(1).

Kachikian also tries to support his argument by contending that the phrase "electronic, mechanical, or other device," as found in § 2512, is a term of art that excludes devices destined for use by law enforcement. He bases this on the definition found in the statute: "'electronic, mechanical, or other device' means any device or apparatus which can be used to intercept a wire, oral, or electronic communication other than . . . [a device] being used by a provider of wire or electronic communication service in the ordinary course of its business, or by an investigative or law

enforcement officer in the ordinary course of his duties." 18 U.S.C. § 2510(5)(a). Though he did not propose such an instruction, Kachikian claims that the court should have instructed the jury that, in order to prove that Kachikian was guilty of the crime, the government would have to prove he did not intend for law enforcement to possess the device.

Once again, Kachikian misunderstands the language of the statute. The verb "to use" is in the present, not the future, tense. The exception applies to devices *being used*, not *to be used*. A device that "can be used" to intercept wire communications is not removed from the reach of the criminal statute until it is actually "being used" by law enforcement. It is irrelevant, therefore, whether or not Kachikian may have intended Telesleuth to be used by law enforcement. At the time Kachikian acted, he knew that his creation was not in fact being used by law enforcement, so there can be no prejudice from a lack of instruction on wiretapping devices for use by law enforcement. Furthermore, an instruction that defines "electric, mechanical, or other device" as a device not for use by law enforcement would have improperly shifted the burden of proof to the government to show that the type of device Pellicano used was never meant for use by law enforcement. It was not plain error for the court not to have issued such an instruction.

A mistaken belief that Kachikian was manufacturing the device for law enforcement was no defense under § 2512. Kachikian argued that he manufactured the device for another purpose, without knowing that it could potentially be used as a wiretapping device, but the instruction as given contemplated that defense, and the jury was not persuaded by it. Theoretically, he might have had a valid defense if either (1) he did not intentionally manufacture the device (e.g., he

manufactured it by accident), or (2) he was a government employee or under government contract to manufacture the device. Kachikian did not argue or present any evidence in support of either of these defenses at trial, however, so the lack of an instruction covering those circumstances was not an abuse of discretion.

### c.  Good-faith instruction

At trial, Kachikian proposed the following instruction: "That Defendant Kevin Kachikian actually believed, even if mistakenly, that Defendant Pellicano intended to market the Telesleuth software and related hardware components to law enforcement is a complete defense [to all counts with which he was charged] because Mr. Kachikian would not possess the requisite 'knowledge' and 'intent' to be convicted of these offenses."  The district court declined to give the proposed instruction.  That decision was not erroneous.

The proposed instruction was not a proper statement of the law.  It would have required the jury to acquit Kachikian if he believed that Pellicano intended to sell to law enforcement, even if he also knew that Pellicano was planning to use the software and other devices for illegal wiretapping.  It was also incorrect because, as explained above, it did not matter whether Kachikian believed Pellicano intended to market the device to law enforcement. He did not fit the exception provided within the statute, and the statute does not broadly exclude potential law enforcement usage. It was enough that he knew the device could be used primarily to intercept wire communications. Accordingly, the court did not abuse its discretion in rejecting the proposed instruction.

### d.  Supplemental instruction

Counsel for Kachikian stated in closing—even after the court rejected his erroneous interpretation of surreptitious—that law enforcement wiretaps are not surreptitious because "those who have their calls intercepted . . . are notified at the end of the wiretap."  The court thereafter issued a supplemental jury instruction to cure counsel's misstatement of the law: "[W]ith regard to Count 77, in determining the meaning of 'surreptitious,' it is not relevant that notification of the interception may later be given." In doing so, the court did not abuse its discretion or violate any procedural rule. *See* Fed. R. Crim. P. 30 advisory comm. n. to 1987 amend. ("[T]he court retains power . . . to add instructions necessitated by the arguments.").

### e.  Recording oneself

Kachikian argues that the district court erred in failing to instruct the jury on the wiretapping exception set forth in § 2511(2)(d), which specifies that it is not a violation of the statute to record one's own telephone conversations.[11]  He bases this contention on the fact that the jury convicted him of conspiring to wiretap, yet simultaneously acquitted him of all counts charging him with the substantive crime of

---

[11] The full text reads: "It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."  18 U.S.C. § 2511(2)(d).

wiretapping. Kachikian presented no such instruction, so review is for plain error.[12]

Theoretically, if Kachikian were guilty of conspiring to intercept wire communications, and if one of his co-conspirators were guilty of the crime of interception of wire communication, and if the substantive wiretapping violations were foreseeable as a necessary or natural consequence of the conspiracy, then Kachikian should have been found guilty of the crime of illegal interception. *See Pinkerton v. United States*, 328 U.S. 640, 645 (1946). The jurors were instructed as much. According to Kachikian, the inconsistent verdict shows that the jurors mistakenly believed that Pellicano's recording of his own conversations was illegal, and because Kachikian admitted he knew Pellicano was using Telesleuth to record his own calls, they convicted him for conspiracy even though they did not believe Kachikian intended to help Pellicano wiretap others.

In substance, the argument is less a complaint about an error in the instructions than it is about a potentially inconsistent verdict, but an inconsistent verdict is not in itself

---

[12] Kachikian argues that review should be de novo because he objected to a supplemental instruction defining the "object" of the conspiracy as not limited to the substantive wiretapping counts, but rather "interception of wire communications" generally. However, his objection complained that the supplemental instruction created a variance from the indictment's charged scope of agreement, not that it allowed conviction for helping Pellicano record his own calls. Kachikian proposed no instruction relating to the affirmative defense contained in 18 U.S.C. § 2511(2)(d), and the court had no duty to issue such an instruction *sua sponte*. *See United States v. Gravenmeir*, 121 F.3d 526, 528 (9th Cir. 1997) (upholding non-instruction on statutory exception and noting this circuit's "well-settled rule that a defendant bears the burden of proving he comes within an exception to an offense").

a sufficient reason to set aside a conviction. *See United States v. Powell*, 469 U.S. 57, 66 (1984). A conviction for conspiracy is not necessarily inconsistent with a failure to convict on substantive charges. *See United States v. Fiander*, 547 F.3d 1036, 1040–41 (9th Cir. 2008). Perhaps the jury believed the evidence sufficient to show Kachikian conspired with Pellicano to illegally wiretap someone, but insufficient to show that he conspired as to the specific individuals and instances named in the indictment.

There was, in any event, no obvious error in the instructions, if there was error at all. *See Johnson*, 520 U.S. at 467 (citing *Olano*, 507 U.S. at 734) (noting that "plain" error is synonymous with "clear or obvious" error). Kachikian did not argue at trial that he believed Pellicano intended only to record his own conversations. *See United States v. Anderson*, 201 F.3d 1145, 1152 (9th Cir. 2000) ("A failure to give a jury instruction, even if in error, does not seriously affect the fairness and integrity of judicial proceedings if the defense at trial made no argument relevant to the omitted instruction.").

For these reasons, we affirm Kachikian's conviction against his jury instruction challenges.

## E. Nicherie's Conviction for Aiding and Abetting Wiretapping

Nicherie was convicted for aiding and abetting wiretapping. He argues that his conviction must be overturned because subsequent developments in the law have invalidated one of the two theories presented by the prosecution, and it is impossible to know which theory the jury relied on in returning a guilty verdict. He also argues

that there was insufficient evidence to establish illegal activity on his part within the relevant time period. Under the statute of limitations, any conviction must be based on conduct after October 26, 2000.  We agree that one of the government's theories was improper.  There was sufficient evidence to support a conviction on the other theory, but the evidence was not so overwhelming to cause us to conclude that the error was harmless. As a result, we vacate the conviction.

During trial, the government presented two distinct theories of Nicherie's guilt on the charge of aiding and abetting wiretapping, arguing that either could support a conviction.  One was that he hired Pellicano to wiretap Ami Shafrir.  The other was that he listened to and translated recordings of Shafrir's intercepted phone calls.[13]  In order to convict, the jury had to find that Nicherie either (1) paid Pellicano for wiretapping services after October 26, 2000, or (2) listened to and translated recordings of an ongoing wiretap after October 26, 2000.

The government's first theory was valid.  If the jury found that Nicherie hired Pellicano to do the wiretapping during the relevant period of time, meaning after October 26, 2000, he could properly be convicted of aiding and abetting the interception.  Nicherie argues that the evidence was insufficient to support a conviction on that theory, but we disagree. The evidence included testimony from Sarit Shafrir

---

[13] In closing, the government postulated: "It is proved that Defendant Nicherie hired Defendant Pellicano for the purpose of wiretapping Ami Shafrir, and that he knowingly aided and abetted that wiretapping by hiring him, by paying him, and by sitting in the Pellicano Investigative Agency lab and listening to and translating the intercepted conversations."

that Nicherie told her he had hired a private investigator "[a]round August of 2000 until December, January of 2001," and testimony from Tarita Virtue that Pellicano told her that the Nicherie brothers retained PIA to perform wiretapping services at "the end of 2000, beginning of 2001." The government also introduced evidence that Nicherie paid Pellicano to wiretap prior to the relevant period and argued that this meant Nicherie had both the desire and the means to do so during the relevant period. This evidence included checks to Pellicano from Gedese Management, which Sarit Shafrir testified was one of Nicherie's shell companies. She also testified that the checks were signed by Nicherie. We conclude that the evidence presented was sufficient for a rational jury to find that Nicherie aided and abetted the wire interception by procuring Pellicano's services within the statute of limitations period.

The second theory, however, was rendered legally defective by this court's later ruling in *Noel v. Hall*, 568 F.3d 743 (9th Cir. 2009), in which we held that playing a recording of a previously intercepted wire communication did not amount to a new interception in violation of the Wiretap Act. "No new interception occurs when a person listens to or copies the communication that has already been captured or redirected. Any subsequent use of the recorded conversation is governed not by the prohibition on interception, but by the prohibition . . . on the use and disclos[ure] of intercepted wire communications." *Id.* at 749 (second alteration in original) (internal quotation marks omitted).

The instructions given to the jury allowed conviction for aiding and abetting a wire interception based on the theory that translating a recording of a previously intercepted wire

communication constituted a crime.[14]  Because Nicherie did not object to the jury instruction at trial, we review for plain error, as discussed above at 22.  On direct review, changes in the law between the time of trial and the time of appeal are applied to illuminate error even if the error might not have been apparent at the time of the trial. "[I]t is enough that an error be 'plain' at the time of appellate consideration." *Johnson*, 520 U.S. at 468.

The error in the jury instructions was plain under *Noel*. The crime of wiretapping was complete when the recording was made, and replaying the recording did not constitute a new interception.  Because "a defendant may not be convicted of aiding and abetting a completed offense," *United*

---

[14] The instructions were as follows:

> In order for Defendant Nicherie to be found guilty of aiding and abetting the interception of wire communications, the Government must prove each of the following elements beyond a reasonable doubt.
>
> First, the crime of interception of wire communications was committed by someone.
>
> Second, Defendant Nicherie knowingly and intentionally aided, counseled, commanded, induced, or procured that person to commit the crime of interception of wire communications.
>
> And third, Defendant Nicherie acted before the crime was completed.
>
> . . . . If you find from the evidence that the interception of wire communications of Ami Shafrir occurred, you must further find that the offense continued after October 26, 2000.

*States v. Lopez*, 484 F.3d 1186, 1191 (9th Cir. 2007) (en banc), Nicherie's subsequent listening and translating did not in itself constitute aiding and abetting the interception of wire communication under § 2511(1)(a) of the Wiretap Act, the offense for which he was charged and convicted.

The government argues that the conviction was not inconsistent with *Noel* because the evidence permitted the jury to find that Nicherie's review and translation of the recordings occurred while the wiretap hardware remained in place, after October 26, 2000, so that his actions aided the continuation of the wiretapping. Yet each discrete interception is a violation of the statute, and thus each recording is associated with a completed crime. A conviction for aiding and abetting interception therefore cannot be based only on review and translation of previously recorded communications. As *Noel* specifically held, subsequent use of the recorded conversation, including listening to and translating its contents, is governed by the prohibition on use and disclosure of intercepted conversations. Misuse of previously intercepted information is not what Nicherie was charged with or convicted of doing.

Even though there was sufficient evidence for the jury to convict on the first "procurement theory," the evidence was not so overwhelming that the instructional error regarding the second "listening and translating" theory was harmless. *See United States v. Harrison*, 585 F.3d 1155, 1161 (9th Cir. 2009) (erroneous jury instruction was not harmless when evidence in support of the proper ground was "ambiguous"); *cf. Johnson*, 520 U.S. at 469–70 (reversal for erroneous jury instruction was unwarranted where supporting evidence was "overwhelming"). It is reasonably possible that the jury rejected the non-time-barred evidence supporting the first

theory and convicted instead on the second theory. Therefore we conclude that Nicherie's substantial rights were affected by the instructional error, as the jury's verdict may have been based on a factual finding that did not support the conviction. *See Harrison*, 585 F.3d at 1161. The plain error standard is satisfied.

As a result, we vacate Nicherie's conviction for aiding and abetting a wire interception and remand for such further proceedings as may be appropriate. If the government so decides, it may seek to retry Nicherie on the charge.

## F. Attorney-client privilege and work product doctrine

As described above, the enforcement of a search warrant for PIA's offices in November 2002 led to the discovery of recordings Pellicano had secretly made of his phone calls with Christensen. In the recorded calls Pellicano and Christensen discussed the wiretap on Lisa Bonder, the ex-wife of Kirk Kerkorian, whom Christensen represented in child support litigation. The government subsequently obtained a broader warrant permitting the seizure of the recordings, and they became key evidence of the Bonder wiretap in the second trial.

Pellicano and Christensen argue that the recordings of their conversations discussing the Bonder wiretap should not have been released to the prosecutors in this case and thereafter admitted into evidence in the second trial because their conversations were protected under the attorney-client privilege. Defendants argue that Christensen hired Pellicano as a private investigator to assist Kerkorian in litigation against Bonder. Because the recordings reflected

conversations between Christensen and Pellicano discussing the litigation and revealing confidences of Christensen's client, Kerkorian, they contend that the attorney-client privilege protected the recordings. They also argue that we should reverse the district court because it failed to follow the procedures for handling the investigation of potentially privileged materials established in *United States v. Zolin*, 491 U.S. 554 (1989).

Although we agree that the district court initially erred in not applying *Zolin*, the district court recognized its own error and reconsidered its decision under the correct framework. Any error in not applying *Zolin* earlier in the case was harmless.

We affirm the result of the district court's reconsidered *Zolin* analysis. The substantial majority of the recordings did not qualify for protection under the attorney-client privilege, and production of the limited portions that might have been privileged was harmless. Neither did the recordings qualify for protection under the work product doctrine.

### 1. *Standard of Review*

"Whether an evidentiary showing is sufficient to allow *in camera* review under the *Zolin* test is a mixed question of law and fact subject to de novo review." *In re Grand Jury Investigation*, 974 F.2d 1068, 1071 (9th Cir. 1992); *see also Grand Jury Subpoena 92-1(SJ)*, 31 F.3d 826, 829 (9th Cir. 1994). Once an adequate showing under *Zolin*'s first step has been made, "the decision whether to engage in *in camera* review rests in the sound discretion of the district court." *Zolin*, 491 U.S. at 572. Under *Zolin*'s second step, "'rulings on the scope of the privilege,' including the crime-fraud

exception, 'involve mixed questions of law and fact and are reviewable *de novo*, unless the scope of the privilege is clear and the decision made by the district court is essentially factual; in that case only clear error justifies reversal.'" *In re Napster, Inc. Copyright Litigation*, 479 F.3d 1078, 1089 (9th Cir. 2007) (citation omitted), *abrogated on other grounds by Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100 (2009).

### 2. *Reconsideration under the correct* Zolin *process*

After the government obtained the Pellicano-Christensen recordings, it recognized that the recordings could contain privileged information. So, it set up a system to screen the recordings for privilege. The district court described that system:

> Recognizing that Pellicano regularly engaged in work relating to legal matters and at the behest of attorneys, the government established a separate group of attorneys and investigators—the "filter team"—to screen items for privilege before the items were released to the team investigating the underlying case.
>
> Among the materials seized were numerous recordings of phone conversations between Christensen and Pellicano. The filter team believed that the conversations were not privileged and were in furtherance of a crime. The team [filed an ex parte application] for a court order stating such and allowing the team to release the recordings to those investigating the underlying case.

The district court then granted a court order permitting the filter team to release the recordings.

Christensen argues that in granting the court order, the district court did not follow the correct process under *Zolin* to determine that the Pellicano-Christensen recordings were not privileged or work product protected. *Zolin* requires a district court to follow a two-step ex parte process to determine whether the crime-fraud exception applies to potentially privileged materials, such as the Pellicano-Christensen recordings. 491 U.S. at 572. First, "the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *Id.* (citation and internal quotation marks omitted). Second, if the government makes such a preliminary showing based on evidence other than the potentially privileged materials themselves, the court may conduct an *in camera* review to determine whether the materials are privileged and, if so, whether the crime-fraud exception applies. *Id.*

In initially releasing the Pellicano-Christensen recordings to government investigators, the district court did not follow *Zolin*'s two-step process. The government filed an ex parte application seeking a crime-fraud ruling on the Pellicano-Christensen recordings that cited their content. The district court granted the application without referencing or applying *Zolin*. Later realizing its error, the district court reconsidered the issue under the correct two-step process in ruling on a motion by Christensen to dismiss the indictment or suppress

the recordings.[15]    The district court concluded that the government made a sufficient showing under step one of *Zolin* to warrant *in camera* review.  The district court then conducted an *in camera* review of the recordings and held that (1) the recordings were neither attorney-client privileged nor work product protected, and (2) even if they were, the crime-fraud exception applied.

The district court did not err in reconsidering privilege and crime-fraud issues under the correct *Zolin* framework after it had erroneously considered the content of the recordings in its initial ruling on the government's ex parte application. *United States v. de la Jara*, 973 F.2d 746 (9th Cir. 1992), is instructive. There, the district court admitted a letter to the defendant from his attorney after ruling *sua sponte* that the letter fell within the crime-fraud exception. *Id.* at 748. The district court did not follow *Zolin* in admitting the letter. This court affirmed on the ground that the defendant had waived the attorney-client privilege. *Id.* at 749. Had it not affirmed on that ground, the court explained, it "would be required to remand the case to the district court" to properly apply *Zolin*. *Id.* at 749 n.1. As the district court in the present matter rightly pointed out, if we would remand for a district court to fix a mistake in applying *Zolin*'s two-step process after the court saw the potentially privileged document, "surely [it's] acceptable for the district court to correct its own mistake before the appeal."

We routinely trust juries to follow limiting instructions when evidence is erroneously admitted. *See United States v.*

---

[15] Christensen filed a motion to recuse the district judge because she had been exposed to the content of the recordings. The motion was denied by a different district judge.

*Mende*, 43 F.3d 1298, 1302 (9th Cir. 1995) (explaining that jurors are presumed to have "follow[ed] the district court's limiting instructions"). We similarly trust district judges to put evidence out of their minds. The granting of a motion to strike evidence in a bench trial does not routinely result in a mistrial simply because the district judge has already heard the evidence that should not have been presented. Instead, the district judge is expected to disregard the improper evidence. District judges are especially adept at reconsidering prior decisions, as they are asked to do so all the time. *See* C.D. Cal. L.R. 7-18 (explaining standard for reconsideration).

Moreover, it is analytically easy for a judge to separate what is appropriate to consider at each step of the *Zolin* analysis. At step one, the judge may consider only evidence other than the potentially privileged material itself. At step two, the judge must also consider the content of the material. There is no reason to believe this analytical framework cannot be applied properly just because the judge got a sneak peek at step-two evidence.

In sum, although it was error for the district court not to follow *Zolin*'s two-step process, *de la Jara*, 973 F.2d at 749, the error was harmless because the district court properly reconsidered its decision under the correct standard as soon as the error was brought to its attention. *See United States v. Chen*, 99 F.3d 1495, 1503 (9th Cir. 1996) (holding that the government's error in submitting potentially privileged material with an ex parte application for *Zolin* crime-fraud determination was harmless because the district judge explicitly disregarded the allegedly privileged materials). It makes no difference that in *Chen* the district judge caught the mistake in the government's submission before issuing an order, whereas here the district judge corrected the error after

issuing an order stating the crime-fraud exception applied. In both cases, the defendants got what they were entitled to: a district court properly applying *Zolin* without considering the content of the potentially privileged materials.[16]

### 3.   Zolin*'s first step*

The district court did not err in holding that the government met its minimal burden under *Zolin*'s first step.

*Zolin*'s first step requires "a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *Zolin*, 491 U.S. at 572 (citation and internal quotation marks omitted). The government must make only "a minimal showing that the crime-fraud exception could apply." *Grand Jury Investigation*, 974 F.2d at 1071. "Some speculation is required under the *Zolin* threshold." *Id.* at 1073. The threshold is "not . . . a stringent one" because "*in camera* review of documents is a much smaller intrusion on the attorney-client privilege than full disclosure." *Id.* at 1072. The first step is meant only "to prevent 'groundless fishing expeditions.'" *Id.* at 1073.

The district court correctly held that the government made a step-one showing. A reasonable person could believe, in

---

[16] We reject Christensen's argument that the district court improperly considered the content of the recordings even when reconsidering the issue. The court expressly considered only the "non-privileged evidence" the government submitted, and the court's analysis did not refer to the content of the recordings.

good faith, that the crime-fraud exception may have applied to the recordings based on the following:

1. Evidence that Christensen represented Kerkorian in a child support dispute with Bonder.

2. Evidence that Christensen's firm had paid Pellicano $186,000 near the time of the recorded conversations at issue.

3. An FBI record reflecting Pellicano's former girlfriend's statement that Pellicano told her he was listening to Bonder's conversations.

As the district court explained, this evidence "raised the inference that the $186,000 was, at least in part, in exchange for illegal wiretapping services."[17] We agree. Although the district court's analysis required "some speculation" that Christensen, in a misguided attempt to represent Kerkorian vigorously, hired Pellicano to wiretap Bonder, such speculation was permitted under *Zolin*'s first step. *Id.* at 1072–73.

The district court also had additional evidence before it to conclude that *Zolin*'s first step was met. The government produced evidence that Pellicano recorded many other persons with whom he discussed wiretapping. This evidence would support a good faith belief by a reasonable person that the Pellicano-Christensen recordings might contain similar discussions about wiretapping, especially in the context of Christensen's representation of Kerkorian and the large sums

---

[17] The rules of evidence do not apply to a court's preliminary determination on whether a privilege exists. Fed. R. Evid. 104(a).

of money Christensen's firm had paid Pellicano. The affidavit also recounted testimony from former PIA employees that "confirmed the widespread use of wiretapping in Pellicano's investigations."

We conclude that the government made the requisite "minimal showing" that the Pellicano-Christensen recordings might contain evidence showing the crime-fraud exception applied to any privileged communications within them. *Cf. Grand Jury Subpoena 92-1(SJ)*, 31 F.3d at 830 (holding that the government met *Zolin*'s first step in case involving illegal exports where affidavit based on "testimony of two former employees . . . as well as on telephone records, invoices, and other documentary evidence" established that a corporation used an export license to disguise illegal exports and sought its counsel's legal assistance in furtherance of the scheme).

### 4.   Zolin*'s second step*

Under *Zolin*'s second step, the district court conducts an *in camera* review to determine whether the materials are privileged and, if so, whether the government has made a prima facie showing that the crime-fraud exception applies. *Zolin*, 491 U.S. at 572; *see also United States v. Bauer*, 132 F.3d 504, 509 (9th Cir. 1997). The district court here concluded that "[n]early all of the communications appear not to be protected by the attorney-client privilege . . . . No more than a few statements in the approximately six hours of tape recordings even arguably reveal what might be confidential information from or concerning Kerkorian." To the extent that a small portion of the recordings might otherwise have qualified as confidential, the district court concluded that they were not privileged because they did not relate to legal

advice, were in furtherance of illegal activity, or fell within the crime-fraud exception.

We agree with the district court that the attorney-client privilege applied at most to limited portions of the Pellicano-Christensen recordings. We do not find it necessary to consider the crime-fraud exception, because it is apparent that the production of those portions was harmless. Extensive incriminating evidence of the illegal wiretapping was available within the portion of the recordings not covered by the attorney-client privilege. The small fraction of the recordings that might have entailed privileged communications was not so large or intertwined with the rest of the recorded conversations as to require the extension of the privilege over all of the recordings. As for the work product doctrine, Defendants waived any argument that this doctrine applied by failing to raise the issue in their briefs. Even if we were to reach the issue, we agree with the district court that the work product doctrine did not apply to the illegal wiretapping. In the end, we conclude that the district court did not err in releasing the recordings under *Zolin*'s second step or in permitting use of the recordings at the second trial.

### 5. *Attorney-client privilege*

"The attorney-client privilege protects confidential disclosures made by a client to an attorney . . . to obtain legal advice . . . as well as an attorney's advice in response to such disclosures." *Chen*, 99 F.3d at 1501 (citation and internal quotation marks omitted); *see also Bauer*, 132 F.3d at 507 (explaining that the "attorney-client privilege is a two-way

street").[18] The purpose of the attorney-client privilege is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Clients must be able to consult their lawyers candidly, and the lawyers in turn must be able to provide candid legal advice. *Chen*, 99 F.3d at 1499–1501.

A communication from the attorney to the client that does not contain legal advice may be protected if it "directly or indirectly reveal[s] communications of a confidential nature by the client to the attorney." *In re Fischel*, 557 F.2d 209, 212 (9th Cir. 1977) (holding that attorney-client privilege did not protect attorney's summaries of client's business transactions). Further, a communication from the attorney to a third party acting as his agent "for the purpose of advising and defending his clients" also may be protected if it reveals confidential client communications. *United States v. Judson*, 322 F.2d 460, 462 (9th Cir. 1963); *see also United States v. Jacobs*, 322 F. Supp. 1299, 1303 (C.D. Cal. 1971); Paul R. Rice, *Attorney-Client Privilege in the United States* § 3:3 (2014) (explaining that "courts have extended the privilege to

---

[18] The attorney-client privilege has eight elements:

> "(1) When legal advice of any kind is sought (2) from a professional legal adviser in his or her capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are, at the client's instance, permanently protected (7) from disclosure by the client or by the legal adviser (8) unless the protection be waived."

*United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002).

confidential communications . . . from the attorney to the agent, and from the agent to the attorney (provided that the communications not from the client reveal prior confidences of the client)"). The government does not dispute that communications between a lawyer and a private investigator retained by that lawyer to assist the lawyer's representation of a client may be covered by the privilege.

"The claim of privilege must be made and sustained on a question-by-question or document-by-document basis; a blanket claim of privilege is unacceptable. The scope of the privilege should be 'strictly confined within the narrowest possible limits.'" *United States v. Lawless*, 709 F.2d 485, 487 (9th Cir. 1983) (quoting 8 Wigmore, Evidence § 2291). An entire document or set of documents may be privileged when it contains privileged portions that are "so inextricably intertwined with the rest of the text that they cannot be separated." *United States v. Chevron Corp.*, 1996 WL 264769, *5 (N.D. Cal. Mar. 13,1996) (citing *Resolution Trust Corp. v. Diamond*, 773 F. Supp. 597, 601 (S.D.N.Y. 1991)). In contrast, "[i]f the nonprivileged portions of a communication are distinct and severable, and their disclosure would not effectively reveal the substance of the privileged legal portions, the court must designate which portions of the communication are protected and therefore may be excised or redacted (blocked out) prior to disclosure." Rice, *Attorney-Client Privilege* § 11:21.

Based on our review of the recording transcripts, we agree with the district court's assessment that "[n]o more than a few statements in the approximately six hours of tape recordings even arguably reveal what might be confidential information from or concerning Kerkorian." Christensen's argument to the contrary is remarkably unspecific. Christensen contends

that two examples cited by the district court did, in fact, reflect confidential client communications: the terms that client Kerkorian would be willing to offer or accept to resolve the litigation and the fact that Kerkorian was putting his faith in the mediator. He also asserts, in a footnote, that "[t]he Recordings contain other statements by Christensen that reference privileged communications from his client, including statements about Kerkorian's litigation objections, his desires to identify Kira's biological father, and other references to the ongoing litigation." That assertion is accompanied by a citation to nine pages from the transcripts of the recordings.

That claim is overbroad. The district court questioned, for example, whether the terms that Kerkorian was willing to offer were actually confidential, noting that those terms might have been communicated by that time to Bonder's counsel. Christensen has not argued to the contrary to us. Aside from that example, it is not nearly enough simply to contend, as Christensen has, that discussions between Pellicano and Christensen included "references to the ongoing litigation." References to the litigation would not necessarily entail the revelation of information confidential to Kerkorian. Indeed, from our review, most such references in the recordings did not.

More importantly, the bulk of the discussion was simply not about Kerkorian. The district court described the recorded communications, referring to Bonder by her married name, Bonder Kerkorian:

> The communications focus on two main topics. The first is Bonder Kerkorian herself. For the most part, Pellicano conveys to

Christensen the content and tone of communications between Bonder Kerkorian and others, including attorneys, friends, and the mediator. Pellicano expresses his own personal feelings concerning Bonder Kerkorian and her lawyers, and provides his own thoughts and advice to Christensen on how Christensen should handle various aspects of the litigation. This subject matter is permeated with the "fruits" of the conversations overheard by Pellicano – apparently through illegal wiretapping.

The second, related topic is the true parentage of Kira Kerkorian. The majority of this discussion focuses on [a named person]. While much of this discussion incorporates the content of Bonder Kerkorian's telephone conversations (Pellicano repeats that Bonder Kerkorian stated [the named person] is a "candidate" for Kira's father, but she later told the mediator he is the father, etc.), a substantial portion also documents Pellicano's apparent efforts to act as a "go-between" to negotiate a deal between [the named person] and Kerkorian.

Christensen did not contest this description. That discussion did not involve confidential disclosures made by Kerkorian to Christensen. There is no attorney-client privilege in favor of Kerkorian over any of that discussion.

The transcripts of the recordings totaled approximately 370 pages. Our review indicates that less than 10 percent of

those pages contained information that may have been confidential to Kerkorian. Christensen has not shown that the potentially privileged portions of the recordings were "inextricably intertwined" with the remainder of the recordings such that they could not be separated, and it does not appear to us that they were. *See Chevron*, 1996 WL 264769 at \*5. Those potentially privileged pages could have been separated from the nonprivileged pages without indirectly revealing client confidences or removing necessary context from the nonprivileged pages.

Even disregarding the possibility that the crime-fraud exception applied to negate the privilege, any error in producing and admitting those portions was harmless. *See United States v. Chu Kong Yin*, 935 F.2d 990, 994 (9th Cir. 1991) ("A nonconstitutional evidentiary error will be reversed for an abuse of discretion only if the court's ruling more likely than not affected the verdict."). Christensen and Pellicano repeatedly and frequently discussed their illegal wiretapping of Bonder throughout the nonprivileged portions of the recordings. That was the evidence that was incriminating, and it was not protected by any privilege.

In sum, the vast majority of the Pellicano-Christensen recordings were not privileged, the remaining portions could have been severed, and any error in admitting the potentially privileged portions was harmless. The district court correctly concluded the attorney-client privilege did not apply.

6. *Work product protection*

Neither Christensen nor Pellicano has presented a separate argument on appeal that the district court should have withheld the recordings or denied their admission into

evidence based on the work product doctrine. Christensen's briefs referred to the attorney work product doctrine only to support his argument that he had standing to object to the seizure of the recordings.[19] Pellicano's briefs made no reference to the doctrine whatsoever. They have, therefore, waived the issue on appeal. *See Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 738 (9th Cir. 1986) ("The Court of Appeals will not ordinarily consider matters on appeal that are not specifically and distinctly argued in appellant's opening brief.").

Even if defendants' vague references to the doctrine were deemed sufficient to raise the issue, we agree with the district court that the work product doctrine did not apply here.

"The work product doctrine, codified in Federal Rule of Civil Procedure 26(b)(3), protects from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation." *In re Grand Jury Subpoena (Torf)*, 357 F.3d 900, 906 (9th Cir. 2004) (citation and internal quotation marks omitted). It requires documents to have "two characteristics: (1) they must be prepared in anticipation of litigation or for trial, and (2) they must be prepared by or for another party or by or for that other party's representative." *Id.* at 907 (citation and internal quotation marks omitted). "At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his

---

[19] In particular, Christensen argued that the attorney work product doctrine confirmed that he personally had a legitimate expectation of privacy in the recordings. We do not reach that issue of standing, for we reject the challenges to the seizure on the merits. The issue is discussed in the separately filed memorandum disposition, at 8–9.

client's case." *United States v. Nobles*, 422 U.S. 225, 238 (1975). The privilege under the doctrine is not absolute. Where it facially applies, it may be overridden if the party that seeks the otherwise protected materials "establish[es] adequate reasons to justify production." *Hickman v. Taylor*, 329 U.S. 495, 512 (1947); *see* Fed. R. Civ. P. 26(b)(3)(A)(ii).

"[T]he purpose of the work product privilege is to protect the integrity of the adversary process." *Parrott v. Wilson*, 707 F.2d 1262, 1271 (11th Cir. 1983); *see also Admiral Ins. Co. v. U.S. Dist. Ct., Dist. of Az.*, 881 F.2d 1486, 1494 (9th Cir. 1989) ("The conditional protections afforded by the work-product rule prevent exploitation of a party's efforts in preparing for litigation."). Not surprisingly, it does not apply to foster a distortion of the adversary process by protecting illegal actions by an attorney. Because its purpose "is to protect the integrity of the adversary process[,] . . . it would be improper to allow an attorney to exploit the privilege for ends that are antithetical to that process." *Parrott*, 707 F.2d at 1271 (holding an attorney's unethical conduct in secretly recording conversations with witnesses vitiated the work product protection as to those recordings) (citing *Moody v. I.R.S.*, 654 F.2d 795, 800 (D.C. Cir. 1981)); *see also In re Doe*, 662 F.2d 1073, 1078 (4th Cir. 1981) ("No court construing [the work product] rule . . . has held that an attorney committing a crime could, by invoking the work product doctrine, insulate himself from criminal prosecution for abusing the system he is sworn to protect."). Indeed, as some of the above precedents indicate, conduct by an attorney that is merely unethical, as opposed to illegal, may be enough to vitiate the work product doctrine. *Parrott*, 707 F.2d at 1271–72; *Moody*, 654 F.2d at 800 ("[A]t least in some circumstances, a lawyer's unprofessional behavior may vitiate the work product privilege.").

Here, the recordings reflected Christensen's illegal attempt to obtain intimate personal information about an opponent in litigation as part of his preparation for trial. The Supreme Court has recognized that the work product protection was necessary to avoid such "unfairness and sharp practices . . . in the giving of legal advice and in the preparation of cases for trial." *Hickman*, 329 U.S. at 511. "It would indeed be perverse . . . to allow a lawyer to claim an evidentiary privilege to prevent disclosure of work product generated by those very activities the privilege was meant to prevent." *Moody*, 654 F.2d at 800. The work product doctrine did not apply here. The district court did not err by making the recordings available to the prosecutors or admitting them into evidence at trial.[20]

## G.  Juror 7's dismissal

Shortly after deliberations began in the second trial, involving defendants Christensen and Pellicano, the court received a series of handwritten notes from members of the jury complaining about one particular juror, identified as Juror 7, and suggesting that he was unwilling to follow the law because he disagreed with it.  After inquiring into the matter, the court found that the juror in question would not follow the law and, in addition, that the juror had lied to the court.  Based on those two independent grounds, the court dismissed the juror in question, seated an alternate, and

---

[20] We assume Kerkorian was not involved in, or aware of, Christensen and Pellicano's criminal conduct. The illegal nature of Christensen's actions, therefore, does not vitiate Kerkorian's interest in non-disclosure of Christensen's work product. Kerkorian has not shown, however, that the disclosure of work product in the recordings "traumatize[d] the adversary process more than the underlying legal misbehavior." *Moody*, 654 F.2d at 801; *Parrott*, 707 F.2d at 1271–72.

instructed the jury to begin its deliberations over again. The reconstituted jury reached verdicts finding Christensen and

Pellicano guilty. Those defendants argue that the dismissal of Juror 7 was improper and that the court improperly denied their subsequent motion for a new trial based on the dismissal of the juror.

We review for abuse of discretion both the dismissal of a juror after deliberations have commenced and the denial of a motion for a new trial based on such a dismissal. *United States v. Vartanian*, 476 F.3d 1095, 1098 (9th Cir. 2007); *United States v. King*, 660 F.3d 1073, 1076 (9th Cir. 2011). The district court's factual findings relating to the issue of juror misconduct are reviewed for clear error. *Vartanian*, 476 F.3d at 1098. "The decision to excuse a juror is committed to the district court's discretion and we must affirm unless we are left with the definite and firm conviction that the court committed a clear error of judgment in reaching its conclusion after weighing the relevant factors." *United States v. Beard*, 161 F.3d 1190, 1194 (9th Cir. 1998) (quoting *United States v. Egbuniwe*, 969 F.2d 757, 761 (9th Cir. 1992) (internal quotation marks omitted)).

We conclude that the district court's findings regarding Juror 7's untruthfulness and unwillingness to follow the law were not clearly erroneous. Those findings provided cause for dismissing the juror. Neither the dismissal of Juror 7 nor the denial of defendants' motion for a new trial was an abuse of discretion.

A court may dismiss a juror during deliberations for good cause. Fed. R. Crim. P. 23(b)(3). Each of the two independent grounds cited by the district court in this case for

discharging Juror 7—that he was not willing to follow the law, and that he had lied to the court—may justify the discharge of a juror.

A juror's intentional disregard of the law, often in the form of juror nullification, can constitute good cause for dismissal of the juror. *See Merced v. McGrath*, 426 F.3d 1076, 1080 (9th Cir. 2005) (noting that "trial courts have the duty to forestall or prevent such conduct" by, inter alia, dismissal of an offending juror (quoting *United States v. Thomas*, 116 F.3d 606, 616 (2d Cir. 1997))). A juror engages in nullification by refusing to return a guilty verdict "in the teeth of both law and facts," *id*. at 1079 (quoting *Horning v. Dist. of Columbia*, 254 U.S. 135, 138 (1920)), or by voting to acquit a criminal defendant "even when the government has proven its case beyond a reasonable doubt," *United States v. Powell*, 955 F.2d 1206, 1212–13 (9th Cir. 1992); *see also United States v. Simpson*, 460 F.2d 515, 519 (9th Cir. 1972) (rejecting the argument that juries should be given more freedom to grant acquittals against the law, also known as "conscience verdicts"). Though we recognize the phenomenon, we also recognize that juror nullification is

> a violation of a juror's sworn duty to follow the law as instructed by the court—trial courts have the duty to forestall or prevent such conduct, whether by firm instruction or admonition or, where it does not interfere with guaranteed rights or the need to protect the secrecy of jury deliberations, . . . by dismissal of an offending juror from the venire or the jury.

*Merced*, 426 F.3d at 1079–80 (alteration in original) (quoting *Thomas*, 116 F.3d at 616).

In contrast, it is not permissible to discharge a juror based on his views regarding the sufficiency of the evidence. *United States v. Symington*, 195 F.3d 1080, 1085 (9th Cir. 1999). Removal in such a case violates a defendant's Sixth Amendment right to a unanimous verdict from an impartial jury. *Id.*

In *Symington*, after five days of deliberation in a criminal financial fraud trial, the jury sent the judge a note complaining about a juror who would not participate in deliberations. *Id.* at 1082–83. The judge wrote back to the jurors reminding them of their duty to deliberate. A few days later the jury sent another, more detailed note explaining why "the majority of the jurors sincerely feel that the juror in question cannot properly participate in the discussion." *Id*. at 1083. After discussing the matter with counsel for both sides, the judge separately questioned each member of the jury to determine the nature of the problem. The other jurors stated that Juror Cotey, a woman apparently in her mid-70's, was confused and unfocused during deliberations, and that she "just seem[ed] to have her mind set." *Id*. at 1084. When the judge questioned Cotey, she stated that "she was willing to discuss elements of the case with the other jurors, but that she became intimidated when everyone talked at once and demanded that she justify her views as soon as she stated them." *Id.* She also "noted that the other jurors' frustration with her might be because 'I can't agree with the majority all the time . . . . And I'm still researching and looking for more in the case.'" *Id.* The judge decided to dismiss Cotey because she was "either unwilling or unable to deliberate with her colleagues." *Id.*

We reversed, holding that "if the record evidence discloses any *reasonable* possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case, the court must not dismiss the juror." *Id.* at 1087 (emphasis in original). In other words, the available evidence must be "sufficient to leave one firmly convinced that the impetus for a juror's dismissal is unrelated to [his or her] position on the merits." *Id*. at 1087 n.5. After reviewing the record, we concluded that, in light of the limited evidence available, "the district court could not have been 'firmly convinced' that the impetus for Cotey's dismissal was unrelated to her position on the merits of the case." *Id*. at 1088 n.7. Because "[t]he statements of some jurors indicated that their frustration with Cotey may have derived more from their disagreement with her on the merits of the case, or at least from their dissatisfaction with her defense of her views," dismissal in that case was improper. *Id*. at 1084.

It may be difficult to determine whether a juror's alleged unwillingness to deliberate stems from his views on the merits or his views on the law. "[A] court may not delve deeply into a juror's motivations because it may not intrude on the secrecy of the jury's deliberations." *Id.* at 1086 (alteration in original) (quoting *United States v. Brown*, 823 F.2d 591, 596 (D.C. Cir. 1987)). This creates "special challenges" for the trial judge attempting to determine whether a problem between or among deliberating jurors stems from disagreement on the merits of the case. *Id*.

We "generally defer to the district court's good cause determinations" because "the district court is in the best position to evaluate the jury's ability to deliberate." *Vartanian*, 476 F.3d at 1098 (alteration and quotation marks omitted) (quoting *Beard*, 161 F.3d at 1194); *see also United*

*States v. Boone*, 458 F.3d 321, 329 (3d Cir. 2006) ("[W]e emphasize that a district court, based on its unique perspective at the scene, is in a far superior position than this Court to appropriately consider allegations of juror misconduct, both during trial and during deliberations.").

Lying to the court about matters related to potential bias may also constitute good cause for dismissal of a juror. *See Vartanian*, 476 F.3d at 1098–99. In *Vartanian*, one juror was observed on multiple occasions speaking to the defendant's family and counsel. This fact was brought to the attention of the court during deliberations via a note from the jury foreperson. *Id*. at 1096. When questioned about her contacts, the juror assured the court that they were minimal, but interviews with other jurors revealed that the contacts were much more extensive. The judge found that the juror in question had "not been forthcoming and entirely truthful with the court and had entirely minimized her contacts." *Id*. at 1097 (internal quotation marks and alteration omitted). Ultimately, the court concluded that it was "unwilling to trust [the juror] to be a fair and impartial juror and dismissed her from service." *Id*. (internal quotation marks omitted). On appeal, we concluded that "the impetus for the jurors' complaints about [the juror in question] was not her willingness to deliberate, but her misconduct outside of the jury deliberation room." *Id*. at 1098. We affirmed the conviction, noting in particular that "the record amply supports the district court's findings that [the juror] was 'untruthful with the court' and 'untrustworthy.'" *Id*. at 1099.

We afford "special deference" to a trial court's adverse credibility finding because the determination of credibility is "largely one of demeanor." *Patton v. Yount*, 467 U.S. 1025, 1038 (1984). This deference need not be tempered by the

concerns raised in *Symington* about the inappropriateness of intruding into deliberations because the evaluation of credibility will not usually require that kind of inquiry. When the concern involves the possibility that a juror has lied to the court, the district court will not always suffer from the same lack of investigative power that limits the court's ability to inquire into problems among deliberating jurors. *Symington*, 195 F.3d at 1086.

   With these legal principles and the standard of review in mind, we turn to the facts of this case. The concern over Juror 7 developed very quickly. Just over an hour after deliberations began, the first note emerged from the jury room. It came from Juror 9:

> Jury Stan #7 dosen't agree with the law, about wire tapping. "Understands what the law is but dosen't agree." States "witness never tell the truth." States "if its ok the government to wire tap + not get caught, then its ok for him."[21]

At the bottom was a request for help signed by Juror 1, the foreperson: "We are unable to move forward[;] we need assistance." A separate piece of paper signed by Juror 3 and sent concurrently stated:

> Wire Tap
>
> If its OK for the government to do it and not get caught.

---

[21] The notes are quoted verbatim, including spelling and grammatical errors.

Then it's should be OK for him.  Stan #7.

In response, the court brought the jury back into the courtroom and reread the following instruction:

It is your duty to find the facts from all the evidence in the case.  To those facts you will apply the law as I give it to you.  You must follow the law as I give it to you, whether you agree with it or not.

Later that day, the court received another note from Juror 9.  It recited some of Juror 7's responses to questions from other jurors.  For example:

Q: "What evidence do you need?"

A: "I want Ray Turner here + to say he wire tapped."

[. . .]

Q: "Do you believe [wiretapping] is illegal?"

A: "In the law we don't have to pay federal taxes, just state taxes."

The bottom portion of the note, signed by Juror 1, explicitly requested an alternate juror because Juror 7 "will not talk about evidence or the law;" "will not participate in deliberations;" and is "ANTI-government."  The final note was unsigned and quoted Juror 7 calling the case "a joke" because "no one died" and announcing, "I don't treat this case seriously."

The court and counsel discussed the question of whether statements attributed to Juror 7 indicated his views on the merits or his views on the validity of the law. The court indicated an intent to question a selection of jurors individually.[22] The next morning, after receiving briefing from the parties on the issue, it correctly decided to do so.[23] *See Bell v. Uribe*, 748 F.3d 857, 867 (9th Cir. 2014) ("The remedy for allegations of juror misconduct is a prompt hearing in which the trial court determines the circumstances of what transpired, the impact on the jurors, and whether or not the misconduct was prejudicial."); *see also Boone*, 458 F.3d at 329 ("[W]here . . . credible allegations of jury nullification . . . arise[] during deliberations, a district court may, within its sound discretion, investigate the allegations through juror questioning or other appropriate means.").

---

[22] The court said: "I know there is at least one Ninth Circuit case on the approach the Court should take. I don't believe that I merely excuse a juror because one or two jurors contend that he is refusing to deliberate. I do believe there is now a colloquy that is required of either [Juror 7] or [Juror 7] plus others. . . . The inquiry will relate to whether he is willing to follow the law and whether he is willing to deliberate."

[23] The court explained: "I have read the emails that were sent last night, two from the Government and one from the defense, and I have read the cases that were cited by both sides, and I have also read a number of other cases along the same lines. . . . I've concluded that the information contained in the notes requires me, or at the very least, permits me to question one or more jurors, and I have determined that that's the course I should take."

Juror 7 was the first to be examined.[24]     He denied

---

[24]     THE COURT: Okay. I have a couple of notes from the jury. I assume that you know that?

THE JUROR: Actually, no, I don't.

THE COURT: Did you write me a note?

THE JUROR: No.

THE COURT: Okay. I have a note from — apparently from a juror that suggests that you have said, "If it's okay for the Government to do it and not get caught, then it should be okay for him." And at the same time I got a note with a little bit different language suggesting that you said, "If it's okay for the Government to wiretap and not get caught, then it's okay for him." Did you say those things or something like those things?

[. . .]

THE JUROR: Well, I didn't say if the Government can wiretap, then he can, whoever "he" referred to. He wrote that note probably based on anger and emotions towards me.

THE COURT: Toward you?

THE JUROR: Yes. He was angry because I disagreed with the majority of the jurors.

[. . .]

THE COURT: Okay. Did you say that you don't agree with the law about wiretapping?

THE JUROR: No, I didn't say that. I said that I cannot agree to judge my decision on circumstantial evidence.

knowledge of the notes from other jurors and disavowed the statements attributed to him regarding both wiretapping and tax laws. Juror 7 suggested that the juror who wrote one of the notes was angry because Juror 7 disagreed with the majority of jurors and because he "c[ould not] agree to judge [his] decision on circumstantial evidence."

The court then questioned five other jurors who all confirmed that the statements in the notes, including "it should be okay for him" to wiretap, and "we don't have to pay federal taxes," were "more or less what [Juror 7] said." Juror 1, the foreperson, was "not 100 percent sure [of what was said] because everybody in the room talks at the same time," but recalled hearing Juror 7 say something about not having to pay federal taxes and confirmed that Juror 7 had said "if it's okay for the government to wiretap and not get caught, then it's okay for him." Juror 9 told the court that she

---

[. . .]

THE COURT: Okay. And after the jury went back to deliberate, I received another note, and that note suggests that perhaps someone said to you, "If you knew someone was wiretapping and the law said it was illegal, do you believe it's illegal?" And that your response was, "In the law we don't have to pay federal taxes, just state taxes." Did you say something like that?

THE JUROR: I don't recall that. At all. That doesn't make sense to me. I couldn't answer to specific questions of wiretapping with the federal taxes.

THE COURT: So you didn't —

THE JUROR: I didn't say anything about taxes.

wrote down Juror 7's statements contemporaneously as he made them; Juror 3 also wrote down Juror 7's statements. Juror 2 told the court that "the words weren't exactly [as written in the notes]," but that was "the substance" of Juror 7's statements. "[H]e said if the federal government can do it and not be found guilty, then a private citizen shouldn't be. That's what it was." Juror 11 likewise confirmed that Juror 7 had expressed doubt about both wiretapping and federal tax law.

After hearing from the parties, the court found there was just cause to dismiss Juror 7. The court found that "Juror No. 7 is not willing to follow the law and will not follow the law in this case." That finding was "based on the statements that [were] in the notes and that the [other] jurors confirmed." The court also found that "Juror No. 7 has lied to the Court," citing that as "an independent ground[] for excusing him."

In the process, the court specifically found "that the five other jurors are credible and that Juror No. 7 is not." The court also found that Juror 7 had lied by omission during voir dire when he did not speak up in response to either the question by the court as to whether any juror had "any feelings about the particular charges against the defendants," or the question by Pellicano as to whether any of the jurors had "any knowledge of [wiretapping laws] or . . . any opinions on [them]."

The district court was aware of the standard set out in *Symington*. The court concluded that the impetus for dismissal stemmed not from Juror 7's views on the merits of the case but from his views on the law. In issuing the ruling, the judge stated, "I don't believe there is a reasonable possibility that even the impetus for the jurors['] notes or

their request for an alternate stems from Juror No. 7's views on the merits."

Because the court "'may not intrude on the secrecy of the jury's deliberations,'" *Symington*, 195 F.3d at 1086 (quoting *Brown*, 823 F.2d at 596), the court's inquiry was necessarily constrained.    The court rightly instructed each juror questioned not to volunteer information beyond what the court asked and not to discuss the content of deliberations or any juror's views on the merits.  Indeed, when questioning the jurors, the court repeatedly had to cut them off mid-sentence to prevent them from running afoul of this instruction.  Nevertheless, because the court was able to confirm from five separate jurors that Juror 7 had made statements expressing disagreement with the wiretapping laws, its inquiry was "sufficient to leave one firmly convinced that the impetus for [Juror 7's] dismissal is unrelated to [his] position on the merits."  *Id*. at 1087 n.5.

We acknowledge that the court's finding regarding Juror 7's unwillingness to follow the law is arguably in conflict with Juror 7's statement during questioning that he disagreed with the other jurors because he "cannot agree to judge [his] decision on circumstantial evidence."  Yet Juror 7 also denied having made statements about the validity of wiretapping and federal tax laws, whereas every one of the other five jurors questioned confirmed that he had in words or substance. Based on this discrepancy, the district court concluded that Juror 7 was not credible.  That finding was not clearly erroneous.  *See Vartanian*, 476 F.3d at 1098.

Under these circumstances, it appears to us highly unlikely that the other jurors were motivated by Juror 7's disagreement with their views on the merits. The first notes

appeared little more than an hour after deliberations began. That is very early in the process, especially after a complicated and lengthy trial. By contrast, in *Symington*, the first note came after five days of deliberations. 195 F.3d at 1083; *see also Brown*, 823 F.2d at 592, 594 (holding that the district court's dismissal of a juror after five weeks of deliberations violated the defendant's right to a unanimous jury, because the record evidence suggested the juror found the evidence insufficient for a conviction). The longer period of time in *Symington* is consistent with a juror attempting to engage in deliberations on the merits but unable to convince his or her cohort. In contrast, one hour is unlikely to have been enough time for the jurors to have ascertained such a difference in their views on the evidence.

Furthermore, unlike in *Symington*, there is not "considerable evidence to suggest that the other jurors' frustrations with [Juror 7] derived primarily from the fact that [he] held a position opposite to theirs on the merits of the case." *Symington*, 195 F.3d at 1088. Juror 7 made it clear from the beginning of deliberations that he did not agree with the wiretapping laws. All of the concerns expressed by the other jurors related to Juror 7's views on the law, not the evidence.[25]  *Cf. id.* at 1084 (observing that other jurors'

---

[25] The dissenting opinion, below at 122–123, expresses the view that there was a reasonable possibility that the other jurors ganged up on Juror 7 because he was a holdout based on his view of the evidence. It asserts that no statements by other jurors refute that proposition and points specifically to a statement by Juror 1 on "how their views on the evidence differed prior to being cut off by the court." Actually, the juror cut himself off, and the comment that he attributed to Juror 7 was not about evidence at all: "He stated that if the federal government charges someone, they're innocent." Not surprisingly, Juror 1 went on to say that the comment "floored everybody in the room." That does not at all

testimony suggested that they viewed the dismissed juror "as an obstacle to reaching a verdict"). The only reference to Juror 7's view of the evidence was his own statement during questioning about the inadequacy of circumstantial evidence, but, as stated above, in light of the contradictory testimony of five other jurors, the court validly discounted Juror 7's credibility. Furthermore, just as in *Vartanian*, the existence of such a passing reference does not necessarily evoke the concerns cited in *Symington* or preclude discharge of the juror for good cause. *See Vartanian*, 476 F.3d at 1099 (observing that a passing reference to the dismissed juror's view that the defendant was innocent did not evoke the concern raised in *Symington* because the basis for the juror's dismissal was her misconduct, not her views on the merits of the case).

In addition, we note that at least one other juror expressed regret as to what happened. Juror 3 stated that Juror 7's comments made her feel "uncomfortable." When the court asked whether Juror 3 had heard Juror 7's comment regarding taxes, Juror No. 3 answered, "Unfortunately, yes." That did not sound like a juror who was looking for a way to get rid of a holdout.

The situation presented here was thus significantly different from the one found problematic in *Symington*. Like the district court, we think it unlikely that Juror 7 was a lone holdout, ganged up on by other jurors who did not agree with or understand his views on the sufficiency of the evidence.

---

suggest that the differences had to do with differing views of the evidence. The problem with Juror 7 identified by the other jurors was that he was not willing to follow the law.

The dissenting opinion concludes that the district court erred by failing to ask Juror 7 point-blank whether he was willing to follow the law. According to the dissent, below at 118, the question of "whether he could follow the law as instructed by the court" was "the most appropriate question" that should have been asked. The dissent repeats that proposition multiple times, see below at 119 & 120–121, culminating with the assertion, at 123 that the failure to ask that question before dismissing Juror 7 based on a lack of credibility was an "obvious error" that "alone is worthy of reversal."

We have previously held, however, that "[a] juror's assurance that he or she can render a fair and impartial verdict is not dispositive." *Egbuniwe*, 969 F.2d at 762 (citing *Murphy v. Florida*, 421 U.S. 794, 800 (1975)). Rather, the proper response to allegations of juror misconduct is a "prompt hearing in which the trial court determines the circumstances of what transpired." *Bell*, 748 F.3d at 867. The law does not require a district court to accept as true whatever it might be told by someone whose conduct has been called into question. A criminal defendant is presumed innocent, but the prosecutor is permitted to prove the contrary. If a juror can be discharged for misconduct, it makes no sense to let that juror's statements that "I did not say that" and "I can follow the law" serve as an automatic free pass, if other evidence supports findings to the contrary. Such a limitation on the district court's freedom to question jurors would be flatly inconsistent with its affirmative "duty" to "forestall or prevent [jury nullification]." *Merced*, 426 F.3d at 1080 (citation and internal quotation marks omitted).

The possibility that Juror 7 might have responded by saying that he would apply the law as instructed is not enough

to require the district court to leave him on the jury if the court has otherwise made findings that would constitute good cause for his removal. The "'determination of impartiality, in which demeanor plays such an important part, is particularly within the province of the trial judge.'" *Egbuniwe*, 969 F.2d at 762 (quoting *Ristaino v. Ross*, 424 U.S. 589, 595 (1976)). For this reason, the judge "is required to make an independent assessment." *Id*. The district court was not required to take Juror 7's word for it.

An independent assessment is what the district court made in this case. It compared Juror 7's version of events with descriptions by five other jurors and determined that Juror 7 was not willing to follow the law. At the same time, the court noted the fact that Juror 7 had lied to the court was an independent ground for excusing him.

The grounds for dismissal cited by the district court were appropriate and permissible. As described above, at 78, 81–83, those findings are reviewed for clear error, and we "generally defer" to these determinations of good cause. The dissent does not contest the standard of review but does not apply it either. For example, it complains, below at 122, that our majority opinion "fails to point to any solid evidence in the record demonstrating that Juror 7 was engaging in nullification." That approach to reviewing the district court's finding has it backwards. To set the finding aside, we have to be persuaded that the finding by the district court that Juror 7 was "not willing to follow the law and will not follow the law in this case" was clearly erroneous. *See Egbuniwe*, 969 F.2d at 761. As described above, at 83–89, the five jurors the district court questioned and found credible reported statements that Juror 7 had made expressing disagreement with the wiretapping law as a matter of

principle. They also reported that Juror 7 had stated, in response to a question about whether he believed the wiretapping law was valid, that "in the law, we don't have to pay federal taxes, just state taxes." The district court reasonably concluded that Juror 7 made this statement to suggest that the Defendants in this case did not have to comply with the wiretapping laws. The court's finding that Juror 7 would not follow the law was thus not clearly erroneous.

Neither was the finding by the district court that Juror 7 had "lied to the court." The dissenting opinion, below at 123–124, characterizes that finding as "clear error," but not because it concludes that Juror 7's responses to the court's inquiry were truthful. Rather, the dissent takes the position that "even an intentionally dishonest answer" does not matter unless it "bespeak[s] a lack of impartiality," citing *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998) (en banc), and noting that the district court cited that decision in denying a motion for new trial.[26] The dissent contends, below at 124,

---

[26] The district court did cite to and quote from *Dyer*, but in connection with a different argument involving an entirely different claim of juror misconduct: a claim based on the alleged failure of one juror to admit that potentially prejudicial comments by a prosecutor had been overheard. That issue is discussed and Defendants' argument rejected in the memorandum disposition filed together with this opinion, at 27–29. We note, moreover, that our decision in *Dyer* was that bias should be attributed to a juror who had answered in the negative to the usual questions during voir dire as to whether any relatives or close friends had ever been the victim of crime or accused of any offense other than traffic cases. It was later discovered that her brother had previously been shot and killed, but not until after she sat as a juror in a murder trial and joined a verdict that convicted the defendant and sentenced him to death. Our court granted habeas relief, concluding that the juror's lies during voir dire warranted an inference of

that "even assuming Juror 7 lied about the federal tax statement, rather than failing to recall saying it as he stated during the questioning by the court, this falsehood does not necessarily bespeak a lack of impartiality."

Here, however, Juror 7's statements about taxes were made in response to questions about whether he believed wiretapping laws were valid. Credible testimony from multiple jurors also confirmed that Juror 7 stated that "[i]f it's okay for the government to wiretap and not get caught, then it's okay for him." Yet Juror 7 failed to mention his views about the wiretapping laws even though he was pointedly asked about them during voir dire.[27] Although *Dyer* concerned potential juror bias, not nullification, just as in that case, Juror 7's lies were material and spoke squarely to the fundamental question of his willingness to follow the law and discharge his duty as a juror. Dismissal on this basis was thus proper.

The district court's factual findings were not clearly erroneous, and they supported its conclusion that there was no reasonable possibility that the impetus for dismissal stemmed

---

implied bias. *Dyer*, 151 F.3d at 981. The point of *Dyer* was not that a juror's lies should be disregarded.

[27] During voir dire, the district court specifically asked: "Will anyone have any difficulty following my instructions and applying the law to this case whether you approve or disapprove of the law as I state it to you?" and "Other than what you have heard already, do you have any feelings about the particular charges against these defendants that would make it difficult for you to be a fair and impartial juror in the case?" Defendant Pellicano asked: "Have any of you formed any opinion about the term 'wiretapping' from reading the newspapers and the government's new. . . legislation regarding wiretapping? Anybody have any knowledge of that or have any opinions on it?"

from Juror 7's views on the merits of the case. Accordingly, the dismissal of Juror 7 does not give reason to set aside the convictions from the second trial or to require a new trial on those charges.

After Juror 7 was dismissed, the jury returned guilty verdicts. Christensen subsequently moved for a new trial. The motion was accompanied by declarations from several jurors regarding what happened in the jury room prior to Juror 7's dismissal. The lower court correctly held that the juror declarations were barred from consideration by Federal Rule of Evidence 606(b), which prohibits a juror from testifying about statements made during deliberations. Defendants argue that Rule 606(b) does not apply because they were inquiring into the juror dismissal rather than the validity of the verdict, but that distinction was rejected in *United States v. Decoud*, 456 F.3d 996, 1018–19 (9th Cir. 2006).

The court then denied the motion. It found that Juror 7's statements, as quoted in the notes, "suggest[ed] a bias on his part against the federal government." The court noted the "numerous discrepancies between Juror No. 7's testimony and that of the other jurors" and reiterated its finding that Juror 7 "lied during the Court's examination and most likely during voir dire with regard to issues that were relevant to his bias in the case." It added: "The submitted juror declarations—even if they were not barred by Federal Rule of Evidence 606(b), which they are—do not undermine the Court's previous findings as to the credibility of the jurors questioned and the conclusions as to Juror No. 7's veracity and willingness to follow the law." We agree.

## H.  Sentencing

We review de novo the district court's interpretation of the Sentencing Guidelines.  *United States v. Rivera*, 527 F.3d 891, 908 (9th Cir. 2008).  The court's application of the Guidelines to the facts is reviewed for an abuse of discretion. *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc).  Factual findings are reviewed for clear error.  *United States v. Treadwell*, 593 F.3d 990, 999 (9th Cir. 2010).  A sentence may be set aside if substantively unreasonable or if procedurally erroneous in a way that is not harmless.  *Carty*, 520 F.3d at 993; *United States v. Acosta-Chavez*, 727 F.3d 903, 909 (9th Cir. 2013).  Procedural error includes failing to calculate or calculating incorrectly the proper Guidelines range, failing to consider the factors outlined in 18 U.S.C. § 3553(a), choosing a sentence based on clearly erroneous facts, or failing to explain the sentence selected.  *Carty*, 520 F.3d at 993.

### 1.  *Christensen*

Christensen was convicted of conspiracy and interception of wire communications in violation of 18 U.S.C. § 371 and 18 U.S.C. § 2511(1)(a).  The district court sentenced him to 36 months of imprisonment for each of the two counts, to be served concurrently.  That sentence was within the range of 30–37 months suggested by the advisory Sentencing Guidelines, based upon the district court's determination that the total offense level was 19 and the criminal history category was I.  The offense level calculation included a three-level upward departure, under U.S.S.G. § 5K2.0(a)(2) (2001), for factors which the district court concluded were not otherwise adequately accounted for in the Sentencing Guidelines.  Without those additional three levels, the total

offense level based solely on the Guidelines would have been 16, with a corresponding range of 21 to 27 months for a criminal history level of I. The court arrived at the offense level of 16 from a base offense level of 9 by adding 2 levels pursuant to U.S.S.G. § 3B1.1(c) for Christensen's supervisory role, 3 levels pursuant to § 2H3.1(b) for pursuing economic gain, and 2 levels pursuant to § 3B1.3 for abuse of a position of public or private trust.

Christensen challenges his sentence as procedurally erroneous, contending the total offense level should be lower because the adjustments made by the court in calculating the total offense level and the three-level upward departure were improper. He also challenges his sentence as substantively unreasonable. We affirm.

### a. Supervisory role

Christensen raises objections to three elements of the district court's calculation of the offense level under the Sentencing Guidelines. One objection is to a two-level upward adjustment on the ground that Christensen occupied a supervisory role over Pellicano.

Under U.S.S.G. § 3B1.1(c), an upward adjustment is appropriate "[i]f the defendant was an organizer, leader, manager, or supervisor" of criminal activity. The district court found that Christensen "was responsible for Mr. Pellicano's conduct, and as indicated in the recorded phone calls, supervised him throughout the retention."

The district court's factual finding was not clearly erroneous. The finding was not "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from

the facts in the record." *Pineda-Doval*, 692 F.3d at 944 (explaining the clear error standard). Even though Pellicano had been engaged in illegal racketeering activities long before Christensen hired him, that does not mean he could not have been led or supervised by someone else while engaging in further illegal activity. It was Christensen who directed Pellicano to wiretap Lisa Bonder's phone line, a wiretap that required the coordinated efforts of five or more people to implement, and it was Christensen who, the district court found, "gave Mr. Pellicano his assignments and told Mr. Pellicano when to cease his activities." That was enough to make him a "leader" or "supervisor" of the criminal activity.

### b. *Economic gain*

Christensen challenges the court's application of a three-level economic gain enhancement under § 2H3.1. The factual finding related to that adjustment was not clearly erroneous, and the court's application of it was not an abuse of discretion.

Under § 2H3.1(b), a three-level upward adjustment is appropriate if "the purpose of the offense was to obtain . . . economic gain." The district court found that "the purpose of the offense was to obtain a tactical advantage in litigation which is an indirect economic gain." Christensen contends that he hired Pellicano merely to assist in identifying the biological father of Bonder's daughter, and that Kerkorian never sought to modify his child support obligation or otherwise obtain financial gain through his litigation with Bonder. Whether or not the wiretapping provided immediate economic gain to Kerkorian, however, is not dispositive. Christensen was motivated by his own economic gain. As the district court observed, "[i]t's always to an attorney's

economic benefit to keep a client happy." That was a logical interpretation of the purpose of the wiretap, and the court's finding was not clearly erroneous.

### c. Abuse of a position of trust

Christensen also argues that the court incorrectly applied a two-level upward adjustment under § 3B1.3 of the Sentencing Guidelines for abuse of a position of trust. Under § 3B1.3, that enhancement should apply "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense."

The district court applied the enhancement, finding that "Christensen abused a position of public trust which significantly contributed to the commission or concealment of the offense." The court noted that Christensen did not hold "the traditional position of trust" with regard to the victims of the wiretapping, but concluded that "[i]n a real sense, the legal community and the justice system are victims of this crime." It elaborated:

> [O]ur entire justice system is based on the theory that attorneys can be trusted to act ethically in representing their clients. Attorneys are officers of the Court and expect to be respected and to have their representations accepted as true. Attorneys also trust each other or at least they are supposed to be able to trust each other not to engage in illegal or unethical conduct. It is hard to imagine how our system could work at all if these fundamental principles weren't

honored by members of the Bar who swore to
uphold them.

Christensen was an attorney. That position was a position
of trust. The application notes to § 3B1.3 explicitly state that
lawyers have a "special skill" as that term is used in the
section and include among the illustrations of an abuse of
trust the example of an embezzlement of a client's funds by
an attorney serving as a guardian.

Christensen argues, however, that he did not use his
position as an attorney to commit or conceal the crime, as
required to apply the enhancement. He also argues that to
qualify for this enhancement the relationship of trust that was
violated must be between the defendant and the victim and
that he did not occupy a position of trust in relation to Lisa
Bonder, the victim of the wiretapping scheme. According to
Christensen, the court applied the enhancement simply
because he was an attorney, which is insufficient to support
the adjustment under § 3B1.3.

As a practical matter, this argument is more theoretical
than real. The district court noted that a close question was
raised by the application of an enhancement under § 3B1.3 to
the facts of this case and that it found no cases directly on
point. It went on to state explicitly, however, that if, based on
the facts here, § 3B1.3 did not support a two-level adjustment
in calculating the offense level, the court would have imposed
the same sentence by applying an upward variance in an
equivalent amount:

> Even if these circumstances do not fit within
> the letter of Section 3B1.3, they certainly fit
> within its spirit, and if a departure under that

section were not appropriate, then a variance would be.  An attorney who abuses his position in this manner and to the degree that Mr. Christensen did here is certainly more culpable and deserving of a greater sentence than one who has no such position to abuse. . . . [H]ad I not imposed the enhancement for abuse of trust and a three level upward departure, I would have concluded for similar reasons that an upward variance in an equivalent amount should be imposed.

We conclude, in any event, that the court's application of the enhancement under these circumstances was appropriate.

The district court recognized that the enhancement applied, by its terms, only if the abuse of trust (or use of special skill) "significantly facilitated the commission or concealment of the offense."  The court found that "Christensen's position as an attorney contributed in a significant way to the commission or concealment of the offenses."  That finding was not clearly erroneous.

The motivation to wiretap Bonder was directly related to Christensen's representation of Kerkorian in his child support dispute with Bonder. Christensen directed Pellicano based on what Christensen knew as Kerkorian's attorney in that dispute. Payment to Pellicano's firm initially came from Christensen's firm. Christensen's status as Kerkorian's attorney and the commission of the offenses for which he was convicted—one count of conspiracy to intercept and use wire communications and one count of interception of wire communications—were not coincidental. It seems likely that

the wiretapping of Bonder would not have occurred but for Christensen's involvement as the attorney for Kerkorian, and it is almost certainly the case that the conspiracy to intercept that included Christensen would not have happened otherwise.

As for the scope of the § 3B1.3 enhancement, we disagree with Christensen's contention that it should apply only if the position of trust that was violated ran between the defendant and the victim of the wiretapping. That view is too constrained. The relevant provision of the Guidelines refers specifically to abuse of "*public or* private trust," suggesting a concern for more than the individual interests of a specific client or beneficiary. *See* U.S.S.G. § 3B1.3. The public interest may be considered. Similarly, § 3B1.3 applies when the defendant has "used a special skill," without regard to whether the victim was the defendant's client.

The upward adjustment has been applied to attorney defendants in circumstances where the victim, defined narrowly, was not the defendant's client. In *United States v. Kubick*, 205 F.3d 1117 (9th Cir. 1999), for example, we affirmed the application of the § 3B1.3 enhancement to an attorney defendant who had assisted his client in bankruptcy fraud. That his client was not the victim did not prevent the enhancement from being applied. *Id.* at 1125.

In *United States v. Goldman*, 447 F.3d 1094 (8th Cir. 2006), in an opinion written by Judge Diane Murphy, a former chair of the Sentencing Commission, the § 3B1.3 enhancement was applied to an attorney who participated in a scheme to help his client fraudulently obtain a loan. Goldman's client was not the victim of the scheme, yet application of the adjustment was affirmed. The court

reasoned: "A defendant acting in his capacity as an attorney occupies a position of public trust. Use of knowledge gained as an attorney to commit a crime subjects a defendant to an enhancement for abuse of a position of public trust under U.S.S.G. § 3B1.3." *Id.* at 1096 (internal citation omitted). In *Goldman*, the victim might narrowly have been identified as the bank that was the target of the scheme, but the court took a broader view, and properly so, citing the defendant's false testimony to the bankruptcy court as an illustration of his abuse of a position of public trust. *See id.*

Similarly, in *United States v. Fitzhugh*, 78 F.3d 1326 (8th Cir. 1996), the Eighth Circuit upheld the application of the two-level enhancement to an attorney defendant involved in a conspiracy to defraud the Small Business Administration, even though his client was not the victim. *Id.* at 1332. The court noted the defendant's "status as an attorney 'shrouded the [transactions] with a presumption of regularity, and thus contributed significantly to facilitating the commission of the fraud,' and his offense 'harmed the legal system he was sworn to uphold.'" *Id.* at 1331–32 (quotations and alterations in original). The concern expressed by the district court for Christensen's abuse of his obligation, as an officer of the court, to the legal system itself is consistent with *Goldman* and *Fitzhugh* and with our understanding of § 3B1.3.

To be sure, the fact that a defendant is also an attorney would not by itself justify application of the enhancement. A lawyer who robbed a bank on the side would likely not qualify under § 3B1.3, because the guidelines require that the position of trust be abused or the special skills be used "in a manner that significantly facilitated the commission or concealment of the offense." But if that requirement is met, the enhancement may apply. As we have concluded that the

district court's finding to that effect was not clearly erroneous, we affirm its application of the enhancement in calculating Christensen's offense level under the Sentencing Guidelines.

#### d. Harm not accounted for in the sentencing guidelines

Christensen contends that the court abused its discretion in imposing a three-level upward departure for substantial harm not accounted for under the Guidelines. Imposing such a departure, the district court explained:

> There is no question that the base offense level does not begin to account for the scope of this particular crime, the invasion of the attorney-client privilege, and the direct and collateral damage to the justice system, as well as the massive invasion of privacy it represents. The Court finds a three level upward departure is appropriate.

The court specifically cited Christensen's "knowing and deliberate efforts to obtain information protected by the attorney-client privilege" and the "number of people who had their privacy invaded." The Sentencing Guidelines themselves authorize such a departure, as the district court noted. U.S.S.G. § 5K2.0(a)(2) (2001).

In imposing the upward departure, the court relied on an application note appearing in the 2007 Guidelines Manual. *See* U.S.S.G. § 2H3.1, cmt. n.3 (2007). The note stated that, for cases "in which the offense level determined under this guideline substantially understates the seriousness of the

offense . . . an upward departure may be warranted." *Id.* One example so identified was a case in which "[t]he offense caused or risked substantial non-monetary harm (e.g. [. . .] a substantial invasion of privacy interest) to individuals whose private or protected information was obtained." *Id.*

Under 18 U.S.C. § 3553(b), a district court may depart upward or downward from the range suggested by the Guidelines calculations based on aggravating or mitigating circumstances "not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." At least since *United States v. Booker*, 543 U.S. 220 (2005), which made the Sentencing Guidelines advisory rather than mandatory, the district court's broader authority to depart from the Guidelines range has been clear. The ability to depart is no longer limited to grounds held to have been inadequately considered in the Guidelines. *United States v. Mitchell*, 624 F.3d 1023, 1030 (9th Cir. 2010) ("[S]entencing judges can reject *any* Sentencing Guideline, provided that the sentence imposed is reasonable."). Indeed, after determining the advisory sentencing range, district courts are expected to consider the factors specifically identified in 18 U.S.C. § 3553(a) before imposing a sentence and to depart above or below the Guidelines range if appropriate. *See Cunningham v. California*, 549 U.S. 270, 286–87 (2007) (noting sentencing courts are "obliged" to consider the Guidelines range as well as sentencing goals enumerated in § 3553(a)).

Although the parties argue at some length about the appropriateness of the district court's reliance on an application note that was not added to the Sentencing Guidelines until after the crime was committed, we do not review any such departure for procedural correctness, as we do upward and downward adjustments in calculating the total

offense level under the Sentencing Guidelines. *See United States v. Ellis*, 641 F.3d 411, 421 (9th Cir. 2011) (explaining that decisions to depart from the Guidelines range are not reviewed for procedural correctness). Instead, we consider this upward departure as part of our review of a sentence's substantive reasonableness. *See id.*

### e. *Substantive reasonableness*

When reviewing a criminal sentence for substantive reasonableness, we apply an abuse of discretion standard. *United States v. Ressam*, 679 F.3d 1069, 1086 (9th Cir. 2012) (en banc). This standard "afford[s] significant deference to a district court's sentencing decision," and "will provide relief only in rare cases." *Id*. at 1086, 1088. "'[W]e may reverse if, upon reviewing the record, we have a definite and firm conviction that the district court committed a clear error of judgment in the conclusion it reached upon weighing the relevant factors.'" *Id*. at 1087 (quoting *United States v. Amezcua-Vasquez*, 567 F.3d 1050, 1055 (9th Cir. 2009)).

"The touchstone of 'reasonableness' is whether the record as a whole reflects rational and meaningful consideration of the factors enumerated in 18 U.S.C. § 3553(a)." *Id.* at 1089 (citation and internal quotation marks omitted). A district court's § 3553(a) determinations are owed significant deference because "[t]he sentencing judge is in a superior position to find facts and judge their import'" due to "greater familiarity with[] the individual case and the individual defendant before [her]." *Gall v. United States*, 552 U.S. 38, 51 (2007) (citations and internal quotations marks omitted). This deference persists "[e]ven if we are certain that we would have imposed a different sentence had we worn the district judge's robe." *United States v. Whitehead*, 532 F.3d

991, 993 (9th Cir. 2008) (citing *Gall*, 552 U.S. at 50); *see also Ressam*, 679 F.3d at 1086; *Carty*, 520 F.3d at 993.

Christensen's specific objection to the three-level upward departure for substantial harm not accounted for under the Guidelines, discussed immediately above, focused on the district court's reliance upon an application note to § 2H3.1, quoted above.    That note first appeared in the 2007 Guidelines Manual.  U.S.S.G. Manual §2H3.1, n.3 (2007). There was no such commentary in the 2001 Guidelines Manual, which applied to Christensen's offenses.  But, as we noted above, we do not review that departure for procedural regularity.  *See Ellis*, 641 F.3d at 421.

There is no challenge to the factual findings by the district court that Christensen's crimes represented "knowing and deliberate efforts to obtain information protected by the attorney-client privilege" and a "massive invasion of privacy." Concerns for the attorney-client privilege or for invasion of privacy were not newly minted at a date after Christensen's offenses. The district court did not abuse its discretion or impose a substantively unreasonable sentence by taking those factors into account.

Christensen's broader argument is that the court imposed a substantively unreasonable sentence because it failed properly to take into account his mitigating personal history and good character.  *See Gall*, 552 U.S. at 52 ("It has been uniform . . . for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." (citation and internal quotation marks omitted)).

The district court concluded that Christensen's background did not justify a downward variance because Christensen was "not so different from hundreds of partners in well-respected firms."  The record reflects rational and meaningful consideration by the court of Christensen's § 3553(a) arguments, as well as a familiarity with the individual case and the individual defendant before the court. The court bluntly stated its individualized assessment of Christensen:

> I heard five weeks of testimony, including hours of absolutely astounding telephone conversations between Mr. Christensen and Mr. Pellicano.  The manner in which Mr. Christensen referred to other respected members of the California Bar and the complete disdain that he had for them and for the law was shocking and outrageous.  It shows that there is another side to Mr. Christensen than the one shown in the letters I received [from Christensen's friends and family].

This is not a case in which we have "a definite and firm conviction that the district court committed a clear error of judgment" in the conclusion it reached upon weighing the relevant factors, *Ressam*, 679 F.3d at 1086 (quotation marks omitted), and as such, it is not one of the "rare cases" in which we conclude that a sentence was substantively unreasonable.  *Id*. at 1088.  Christensen's sentence is affirmed.

### 2.  *Pellicano, Arneson, and Turner*

As discussed above at 35–39, we vacate the computer fraud and unauthorized computer access convictions of Pellicano, Arneson, and Turner.  Their other convictions remain in place.  Nonetheless, we vacate the sentences imposed on them for the convictions that are affirmed.

"When a defendant is sentenced on multiple counts and one of them is later vacated on appeal, the sentencing package becomes 'unbundled.'  The district court then has the authority 'to put together a new package reflecting its considered judgment as to the punishment the defendant deserve[d] for the crimes of which he [wa]s still convicted.'" *United States v. Ruiz-Alvarez*, 211 F.3d 1181, 1184 (9th Cir. 2000) (quotations and alterations in original); *see also United States v. Avila-Anguiano*, 609 F.3d 1046, 1049 (9th Cir. 2010).

As the government acknowledges, when we affirm some counts of conviction and reverse or vacate others, it is our customary practice to remand for resentencing.  *See United States v. Lazarenko*, 564 F.3d 1026, 1047 (9th Cir. 2009). Though we might have the authority to leave the sentences on the affirmed counts in place, *see United States v. Evans-Martinez*, 611 F.3d 635, 645 (9th Cir. 2010), we do not believe that a departure from our usual practice is appropriate in this case.  Accordingly, we vacate the sentences for these three defendants and remand to the district court for resentencing.

We decline to further address the additional challenges presented by these defendants to the now-vacated sentences, except to reject Pellicano's argument that the matter should

be assigned to a different judge for resentencing.  Nothing in the district judge's comments or actions support that request or Pellicano's claim that the judge was predisposed against him

## I.  RICO forfeiture

As part of their sentences, Pellicano, Turner, and Arneson were ordered to forfeit $2,008,250, which represents the proceeds they obtained from their RICO enterprise.  The law provides that a defendant convicted of a RICO offense "shall forfeit to the United States . . . any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity . . . ." 18 U.S.C. § 1963(a)(3).

Defendants argue that they had a right to a jury trial on the forfeiture amount, that the district court used the incorrect standard of proof in ordering forfeiture, that the district court incorrectly calculated the forfeiture amount, and that liability should not have been joint and several. We disagree with these arguments and affirm.

We first address the argument that Defendants had the right to have a jury decide the forfeiture amount. We review de novo the interpretation of federal forfeiture law. *United States v. Newman*, 659 F.3d 1235, 1239 n.2 (9th Cir. 2011). We have held that there is no constitutional right to have a jury decide forfeiture. *United States v. Phillips*, 704 F.3d 754, 769–70 (9th Cir. 2012) (citing *Libretti v. United States*, 516 U.S. 29, 49 (1995)). Similarly, we concluded that Federal Rule of Criminal Procedure 32.2 does not require a jury determination for forfeiture in the form of a personal money

judgment, which is what the government obtained here. *Id.* at 771.

We next address the standard of proof for RICO forfeiture. Forfeiture is an aspect of the sentence, not an element of the underlying crime. *Libretti*, 516 U.S. at 38–39. Accordingly, a district court or jury need only find facts warranting forfeiture by a preponderance of the evidence. *United States v. Shryock*, 342 F.3d 948, 991 (9th Cir. 2003) (concluding that "statutorily-prescribed forfeiture is constitutional when supported by the preponderance of the evidence"); *see also United States v. Fruchter*, 411 F.3d 377, 383 (2d Cir. 2005); *United States v. Najjar*, 300 F.3d 466, 485–86 (4th Cir. 2002); *United States v. DeFries*, 129 F.3d 1293, 1312–13 (D.C. Cir. 1997). *But see United States v. Cherry*, 330 F.3d 658, 669 n.18 (4th Cir. 2003). Rule 32.2's Committee Notes also support the preponderance standard for forfeiture. Fed. R. Crim. P. 32.2, Committee Notes (2000) (explaining that "the government must establish the forfeitability of the property by a preponderance of the evidence"). We thus conclude that the district court did not err in using the preponderance of the evidence standard to compute the forfeiture amount.

Defendants also argue that the district court improperly calculated the amount to be forfeited. The district court determined that PIA's gross receipts, rather than its profits, constituted the "proceeds" properly subject to forfeiture under 18 U.S.C. § 1963(a)(3). Accordingly, the court ordered Defendants to forfeit "proved client payments" to Pellicano, which amounted to $2,008,250. Arneson and Turner argue that this was error.

Some circuits have held that "proceeds" mean gross receipts. *United States v. Simmons*, 154 F.3d 765, 770–71 (8th Cir. 1998); *DeFries*, 129 F.3d at 1313–14; *United States v. Hurley*, 63 F.3d 1, 21 (1st Cir. 1995). Others have held that "proceeds" refers to net profits. *United States v. Genova*, 333 F.3d 750, 761 (7th Cir. 2003) (explaining that proceeds in § 1963(a)(3) means "profits net of the costs of the criminal business").

We agree with the view that "proceeds" in the RICO forfeiture statute refers to gross receipts rather than net profits. As the Eighth Circuit explained:

> The legislative history of the 1984 amendments to RICO states that "the term 'proceeds' has been used in lieu of the term 'profits' in order to alleviate the unreasonable burden on the government of proving net profits. It should not be necessary for the prosecutor to prove what the defendant's overhead expenses were." . . . These statements indicate that Congress meant the word "proceeds" to be read more broadly than merely "profits." . . . In addition, Congress has explicitly directed that RICO "shall be liberally construed to effectuate its remedial purposes." . . . Reading the word "proceeds" broadly has the benefit of punishing, through RICO's forfeiture provisions, all convicted criminals who receive income from illegal activity, and not merely those whose criminal activity turns a profit.

*Simmons*, 154 F.3d at 770–71 (citations omitted); *see also United States v. Peters*, 732 F.3d 93, 99–102 (2d Cir. 2013) (similarly concluding that the term "proceeds" in 18 U.S.C. § 982(a)(2), a criminal forfeiture statute, refers to "receipts" rather than "profits").

Arneson and Turner rely heavily on *United States v. Santos*, 553 U.S. 507 (2008). *Santos* interpreted the term "proceeds" in a money laundering statute.[28] The issue was whether payments to certain people, including lottery winners and those who helped the defendant run an illegal gambling enterprise, constituted money laundering. If "proceeds" in the money laundering statute included gross receipts from the illegal gambling enterprise, then payments to winners and the people who helped run the enterprise would constitute money laundering. If "proceeds" was limited to profits, such payments would not. A plurality explained that the term "proceeds" was ambiguous. *Id.* at 511–14. The rule of lenity required that the term be construed in favor of the defendant to mean "profits," not gross receipts. *Id.* at 514–15.

---

[28] The full statute, 18 U.S.C. § 1956(a)(1), reads as follows: "Whoever, knowing that the property involved in a financial transaction represents the *proceeds* of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the *proceeds* of specified unlawful activity—(A)(i) with the intent to promote the carrying on of specified unlawful activity . . . shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both" (emphasis added). After *Santos*, 18 U.S.C. § 1956 was amended to specifically define "proceeds" as "any property derived from or obtained or retained . . . through some form of unlawful activity, including the gross receipts of such activity." Pub. L. No. 111-21, 123 Stat. 1617 (2009) (codified at 18 U.S.C. § 1956(c)(9)).

Defendants argue that the reasoning of *Santos* compels the same interpretation of "proceeds" in § 1963(a)(3). The issue in *Santos* was quite different, however. The interpretation of "proceeds" in *Santos* affected the scope of criminal liability for money laundering, not the amount of forfeiture.

The Second Circuit recently rejected a similar argument based on *Santos* in interpreting the term "proceeds" in 18 U.S.C. § 982(a)(2), a statute imposing the forfeiture of proceeds as part of the sentence for certain offenses. *Peters*, 732 F.3d at 98–99. *Peters* held that "proceeds" refers to the forfeiture of gross receipts in § 982(a)(2). *Id.* at 101–02. The court rejected the argument that *Santos* required otherwise. *Id.* at 99–101. Under *Marks v. United States*, 430 U.S. 188, 193 (1977), Justice Stevens's concurrence in *Santos* controlled because he reached the result on the narrowest ground, and, unlike the plurality, that concurrence held that "proceeds" meant "receipts" in other contexts. *Santos*, 553 U.S. at 525; *see also Peters*, 732 F.3d at 100. As *Peters* elaborated:

> [A] key point of agreement among the plurality and Justice Stevens was the desire to avoid a "merger problem.". . . In the context of the illegal lottery at issue in *Santos*, the plurality explained that "[i]f 'proceeds' meant 'receipts,' nearly every violation of the illegal-lottery statute would also be a violation of the money-laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery." *Santos*, 553 U.S. at 515. Justice Stevens . . .

agreed with the plurality that Congress could not have intended violations of the money-laundering statute to "merge" in this way with violations of other statutes. *Id.* at 528 & n. 7.

By contrast, the criminal forfeiture statute presents no merger issue. Unlike the anti-money laundering statute, section 982(a)(2) is a form of punishment rather than a substantive criminal offense. There is therefore no risk of what Justice Stevens called a "practical effect tantamount to double jeopardy," *id.* at 527, when section 982(a)(2) captures funds essential to the commission of one of its predicate offenses.

732 F.3d at 100; *see also United States v. Van Alstyne*, 584 F.3d 803, 814 (9th Cir. 2009) (explaining that "[o]nly the desire to avoid a 'merger problem' united" the plurality and Justice Stevens in *Santos*).

*Peters*'s reasoning is persuasive, and we adopt it. RICO forfeiture is a form of punishment rather than a substantive criminal offense. Defining proceeds as gross receipts in this context presents no merger problem. When § 1963(a)(3) requires forfeiture of proceeds obtained from racketeering activity, such forfeiture does not create the problem that the same conduct will give rise to two different crimes.

Finally, Arneson argues that the extent of the proceeds from the racketeering activities was not foreseeable to him, and therefore he should not have been held jointly and

severally liable for the RICO forfeiture. We reject this argument because it misstates the legal standard.

"So long as the sentencing court finds by a preponderance of the evidence that the *criminal conduct* through which the proceeds were made was foreseeable to the defendant, the proceeds should form part of the forfeiture judgment." *Fruchter*, 411 F.3d at 384 (emphasis added) (citing *United States v. Edwards*, 303 F.3d 606, 644 (5th Cir. 2002)). Specific proceeds need not be foreseeable. Hence, where a defendant was "aware of the scope of the racketeering enterprise, its proceeds were necessarily foreseeable to him." *Id*. As discussed above, at 23–27, the evidence amply established that Arneson and Turner knew about the essential nature of the RICO enterprise. Joint and several liability was therefore appropriate. *Simmons*, 154 F.3d at 769–70 ("Codefendants are properly held jointly and severally liable for the proceeds of a RICO enterprise. . . . The government is not required to prove the specific portion of proceeds for which each defendant is responsible.").

The district court did not err in ordering RICO forfeiture in this case. We affirm on this issue.

## IV.    Conclusion

The district court handled this challenging case admirably. Based on developments in the law subsequent to the trial, we vacate Turner's conviction for aiding and abetting computer fraud, Arneson's convictions for computer fraud and unauthorized computer access, and Pellicano's convictions for aiding and abetting both computer fraud and unauthorized computer access. Those defendants' other convictions are affirmed, but their sentences are vacated.

Their cases are remanded for further proceedings, including resentencing on the convictions that stand. The convictions of Christensen and Kachikian are affirmed, and so are the sentences imposed on them. We vacate Nicherie's conviction for aiding and abetting a wire interception, and remand for further proceedings.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**

---

CHRISTENSEN, Chief District Judge, concurring in part and dissenting in part:

Although I concur in most of the majority opinion, I dissent from the portion of the majority opinion affirming the dismissal of Juror 7 in the second trial involving defendants Christensen and Pellicano. Majority op. at 77–96. The district court erred by dismissing Juror 7 based on a determination that Juror 7 was not credible and had lied to the court on an unrelated issue concerning his views on federal tax laws.

Shortly after one hour of deliberations following a 21-day trial, the district court received a confusing note in the handwriting of at least two, and perhaps three of the jurors, which led the court into protracted and tangential interviews of first, Juror 7, followed by interviews of Jurors 1 (the foreperson), 9, 3, 2, and 11, focused on the issue of whether Juror 7 had lied to the district court. At no point during the interview with Juror 7 did the court ask what would have been the most appropriate question, which was whether he could follow the law as instructed by the court. I would

reverse because Juror 7's statements regarding his views on the evidence demonstrate "a reasonable possibility that the impetus for [his] dismissal stem[med] from [his] views on the merits of the case." *United States v. Symington*, 195 F.3d 1080, 1087 (9th Cir. 1999). No other juror refuted Juror 7's statements that he was simply unpersuaded by the evidence, and these statements are far more relevant to the proper inquiry than his purported views on federal tax law.

It is disconcerting to a trial judge to receive a note from a juror, or jurors, in the course of the jury's deliberations following a lengthy trial, other than one advising that the jury has reached a verdict. A juror note requires the trial judge to consult with counsel and to craft a narrow and concise response. When taking the rare act of dismissing a juror, the trial court must safeguard the secrecy of jury deliberations, and steadfastly protect against the dismissal of a juror based on the juror's doubts about the guilt of a criminal defendant. It is only when the juror discloses an intent to purposefully disregard the court's instructions on the law, or commits some other recognized form of misconduct, that the juror must be dismissed. If the evidence in the record supports the possibility that the juror's views on the merits of the case are motivated by doubts regarding the guilt of the defendant, rather than a clearly manifested intent to disregard and nullify the law, then that juror must not be dismissed. *United States v. Thomas*, 116 F.3d 606, 608 (2d Cir. 1997). To do otherwise violates a defendant's Sixth Amendment right to a unanimous jury verdict. *Symington*, 195 F.3d at 1085. In this case, when interviewed by the district court, Juror 7 was never asked whether he could follow the court's instructions on the law or engage in deliberations. And, in fact, during the course of his interview, Juror 7 indicated that he had concerns

regarding the strength of the government's case against the defendants.  It was clear error to dismiss Juror 7.

Federal Rule of Criminal Procedure 23(b) provides that a juror may be dismissed during deliberations for good cause. "Good cause" includes juror illness, juror misconduct, juror nullification, an inability to communicate, or an inability to be fair and impartial, among other reasons.  *See Symington*, 195 F.3d at 1085; *Merced v. McGrath*, 426 F.3d 1076, 1079–81 (9th Cir. 2005).

When a jury seeks the removal of one juror, the court faces the difficult task of determining whether the requested removal stems from a disagreement on the merits of the case. *Symington*, 195 F.3d at 1086.  The court's investigative powers in this circumstance are limited in order to maintain the secrecy of jury deliberations and avoid jeopardizing "the integrity of the deliberative process."  *Id.*  The court's inquiry must not expose the content of jury deliberations.  *Id.* Recognizing this dilemma, this Court has held that "if the record evidence discloses any *reasonable* possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case, the court must not dismiss the juror."  *Id.*  The trial judge must either send the jury back to continue deliberating or declare a mistrial.  *Id.*

In such circumstances, a court's circumscribed inquiry, as the district court here concluded, should focus on "whether [the juror] is willing to follow the law and whether he is willing to deliberate."  The district court in this case, however, strayed from this focus during its interviews, which included interviews of Juror 7 and five other jurors. Importantly, in interviewing Juror 7, the district court never asked whether Juror 7 could follow the law or whether he was

willing to deliberate — it only asked for confirmation of the accusations in the jury notes. Moreover, during the court's questioning of Juror 7, he denied making the statements attributed to him in the jury notes as follows:

- "Well, I didn't say if the Government can wiretap, then he can, whoever 'he' referred to. He wrote that note probably based on anger and emotions towards me."

- "He was angry because I disagreed with the majority of the jurors."

- When specifically asked if he said that he did not agree with wiretapping law, Juror 7 responded "No, I didn't say that. I said that I cannot agree to judge my decision on circumstantial evidence."

- When asked whether he said the law did not require him to pay federal taxes, he said "I don't recall that. At all. That doesn't make sense to me. I couldn't answer to specific questions of wiretapping with the federal taxes. . . . I didn't say anything about taxes."

At this point, based on Juror 7's responses to the district court's questions and the various notes that precipitated the questioning, it was apparent that Juror 7 had problems with the strength of the government's case against the defendants and that he "disagreed with the majority of the jurors" about the merits of the government's case. *Symington* is clear that under such circumstances, the district court should have instructed Juror 7 to return to the jury room and continue with deliberations, or else simply declare a mistrial. *Symington*, 195 F.3d at 1086. Because deliberations were at such an early stage, where the likelihood for miscommunication

between jurors was at its highest and the opportunity for consensus building was at its lowest, instructing the jury to continue with deliberations was the appropriate course, if not the required one.

The district court should not have proceeded to interview Jurors 1, 9, 3, 2 and 11. This Court has emphasized that "juror privacy is a prerequisite of free debate, without which the decisionmaking process would be crippled." *Id.* Accordingly, this Court has cautioned that a trial judge's limited role in investigating alleged juror misconduct "must not compromise the secrecy of jury deliberations." *Id.* The district court's interviews here, of five additional jurors, certainly compromised the secrecy of the jury deliberations. But, to the extent the district court here felt it was necessary to inquire of the other jurors, then the focus of that inquiry should have been extremely narrow and directed to whether Juror 7 could follow the law and whether he was willing to deliberate. Instead, the district court's extensive inquiries of the five additional jurors focused on whether Juror 7 had truthfully answered the court's questions about his alleged statements regarding the federal tax law during deliberations. This turned what should have been a narrow investigation into a sideshow. Moreover, the record makes clear that the questioned jurors' answers to the court's inquiries were rooted, at least potentially, in their disagreement with Juror 7 about his assessment of the merits of the government's case.

The majority discusses juror nullification law at length, but fails to point to any solid evidence in the record demonstrating that Juror 7 was engaging in nullification. The district court had every opportunity to ask Juror 7 if he was willing to follow the law, despite any disagreement with it, but that did not occur. While a direct question as to whether

a juror is willing to follow the law is not always dispositive, *Murphy v. Florida*, 421 U.S. 794, 800 (1975), it is a necessary starting point before a judge may take the rare step of dismissing a juror at the bidding of other jurors who disagree with the subject juror about the merits of the case. To overcome the jury system's "crucial assumption," *Parker v. Randolph*, 442 U.S. 62, 73 (1979) (Rehnquist, J.), that a qualified juror will follow the law, the judge must have some solid evidence of juror nullification.[1]  The district court here failed to ask the most relevant question and thus failed to obtain any direct evidence of jury nullification.  Instead, the district court determined that Juror 7 would not follow the law because it determined that he was "not credible": "Juror No. 7 is not credible and that is why I reach my conclusion about his refusal to follow the law."  This Court's precedent does not allow for juror dismissal based on a vague finding about a juror's general "credibility."  That obvious error alone is worthy of reversal.

The district court likewise concluded, "Juror No. 7 has lied to the Court.  That is an independent grounds for excusing him."  This finding also constitutes clear error because, as the court acknowledged in denying a motion for a new trial, "even an intentionally dishonest answer [during voir dire] is not fatal, so long as the falsehood does not bespeak a lack of impartiality." *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998).  The majority cites *United States v. Vartanian*, 476 F.3d 1095, 1098–99 (9th Cir. 2007) for the proposition that a district court may properly dismiss a juror based on its determination that a juror had been untruthful

---

[1] It is important to remember that prior to being selected to serve on the jury,  Juror 7 was subjected to voir dire questioning, the parties' peremptory challenge, and had survived any challenges for cause.

about his or her potential biases. I do not read *Vartanian* to stand for this broad proposition of law. The juror in *Vartanian* was properly dismissed for "her misconduct outside of the jury deliberation room," including multiple improper contacts with "members of the defendant's family, defense counsel, and apparently even the defendant himself," which, when questioned about by the trial judge, she lied about. *Vartanian*, 476 F.3d at 1098–99. Dishonesty during voir dire is only relevant when it "bespeak[s] a lack of impartiality." *Dyer*, 151 F.3d at 973. Here, even assuming Juror 7 lied about the federal tax statement, rather than failing to recall saying it as he stated during the questioning by the court, this falsehood does not necessarily bespeak a lack of impartiality. His view on federal tax law is not indicative of whether he would follow the wiretapping law as instructed by the court, nor does it indicate that Juror 7 was anti-government.

Even considering the court's conclusion that Juror 7 was not credible, the record supports a reasonable possibility that Juror 7 was a holdout ganged up on by his fellow jurors who disagreed with his views regarding the sufficiency of the evidence. When the court asked Juror 7 whether he made the statements attributed to him by the jury notes, he denied making them, and said that the other jurors were angry with him because he disagreed with them. He then stated that he could not base his decision on circumstantial evidence. These answers raised a reasonable possibility that the impetus for the other jurors to have him dismissed stemmed from his views on the merits of the case. No statements from the other jurors refute Juror 7's statements. Indeed, the record supports the assertion. At one point, Juror 1 (the foreperson) began discussing how his views on the evidence differed with Juror 7's: "[Juror 7] stated that if the federal government charges

someone, they're innocent, and he was—won't accept—I can't talk about evidence." Juror 1 also volunteered "[w]e are all unanimous on it in there.  We have taken a vote . . . ."**[2]** The jury notes similarly indicated that the other jurors disagreed with Juror 7's assessment of the merits of the case. One note specifically alleged that Juror 7 was "ANTI-government," and another note indicated that problems stemmed from Juror 7's "need" for more evidence.  In light of all of this, the majority's conclusion that "[a]ll of the concerns expressed by the other jurors related to the views of Juror 7 on the law, not the evidence" is not persuasive. Ultimately, as in *Symington*, the evidence does not "support any high degree of certainty as to the underlying motive" for the jury's request to dismiss Juror 7,  *Symington*, 195 F.3d at 1088, n.7, but it is under just such uncertain circumstances that dismissal of a juror is improper.

Contrary to the majority's assertion, the speed with which the jury sent out its first note is certainly not clear evidence that Juror 7 was engaging in nullification.  It is just as likely that Juror 7 was adamantly stating his view that the government's evidence was insufficient for a conviction as it is that he was expressing an unwillingness to follow the law, or that Juror 7 was simply taken to flights of hyperbole when encountering hostility to his skepticism about the merits of the government's case.  Likewise, if we are to engage in speculation, it is certainly possible that a vocal few were impatient after a long trial and were trying to force a conviction without a full discussion of the evidence.  As this Court has pointed out previously, it is not for the judge to

---

**[2]** This statement was a clear violation of the court's instruction and would alone have been a sufficient basis to declare a mistrial. *Symington*, 195 F.3d at 1085–87.

inquire or speculate what is going on in the jury room. That is why it was so important for the district court to ask Juror 7 if he was willing to follow the wiretapping law and willing to engage in deliberations with his fellow jurors.

Without that key information, this Court is forced to make baseless assumptions founded on things like the length of deliberations and the fact that the jury convicted once Juror 7 was replaced. I do not believe such conjecture is appropriate when a simple alternative exists—asking the juror if he or she will deliberate and follow the law. The district court's failure to do so here violated the Defendants' Sixth Amendment right to a unanimous and impartial jury. This right is too important to allow removal of a juror based on insufficient questioning and baseless assumptions. The worst thing that could have happened here is that Juror 7 would have remained steadfast in his view that the government had failed to prove its case, resulting in a hung jury and mistrial, a not infrequent result that ensures a defendant's rights under the Sixth Amendment.

The district court confronted an unusual and difficult situation. A couple of vocal and insistent jurors were obviously unhappy with the concerns that Juror 7 expressed concerning the government's case, and set about the effort of getting him removed from the jury so that their desire to quickly convict the defendants could be accomplished. The district court was drawn into this effort, and abused its discretion in removing Juror 7 for reasons unrelated to his ability to follow the law or willingness to deliberate. Having succeeded in getting rid of one juror, the chilling effect on the deliberations of the remaining jurors would be manifest. For that reason, I dissent from the majority opinion. The

convictions of defendants Christensen and Pellicano in the second trial should be reversed and their sentences vacated.